**Sharon SCHNEIDER, Plaintiff–Appellant,**

v.

**COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, Defendant–Appellee.**

**No. 99–35634.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 11, 2000

Filed Aug. 21, 2000

Kathryn Tassinari, Johnson, Cram, Harder & Wells, Eugene, Oregon, for the plaintiff-appellant.

Victoria Blais, Assistant Regional Counsel, Social Security Administration, Seattle, Washington, for the defendant-appellee.

Before: FERGUSON, GRABER, and W. FLETCHER, Circuit Judges.

FERGUSON, Circuit Judge:

Sharon Schneider appeals the district court's decision affirming the administrative law judge's ("ALJ") denial of her application for disability benefits. The primary issue before us is whether the ALJ erred when he failed to consider five letters that Ms. Schneider submitted from friends and ex-employers who describe her functional limitations in the workplace. We determine that the ALJ erred by not considering the lay evidence and that this evidence demonstrates that Ms. Schneider's condition meets the criteria in the medical Listing of Impairments. Therefore, we REVERSE and REMAND for payment of benefits.

## I. BACKGROUND

### A. Medical Background

Ms. Schneider's current application[1] for Supplemental Security Income ("SSI") benefits is based primarily on her intellectual and emotional limitations. At the time of the most recent hearing, Ms. Schneider was 32 years old. She attended twelve years of school, but because of a significant learning disability, she received a "certificate of accomplishment" rather than a high school diploma. Ms. Schneider attended special education classes during most of her school years.

In February 1992, Ms. Schneider was examined by a psychologist, Dr. Basil Johnson, for the purpose of determining the extent of her learning disabilities. Over a period of a few days, Dr. Johnson conducted a series of clinical interviews, as well as extensive psychological testing. The results of the tests showed that Ms. Schneider had a "marked impairment with written vocabulary skills, and moderate impairment of abstract reasoning," suggesting that her intellectual functioning was "within the clinically definable range of low average." Although these learning disabilities would likely impair her ability to "obtain more than unskilled labor employment," Dr. Johnson did not believe that Ms. Schneider experienced any "major mental disorder" that would prevent

---

1. This is Ms. Schneider's third application for SSI disability benefits. Her prior two applications, which were filed in May 1989 and in March 1992, were both denied.

her from maintaining a "socially acceptable and productive" life.

A few months later, in May 1992, another psychologist, Dr. Judith Eckstein, examined Ms. Schneider. Dr. Eckstein's testing indicated that Ms. Schneider had a verbal IQ of 78 (Borderline Mental Retardation), a performance IQ of 80 (Low Average), and a full scale IQ of 77 (Borderline Mental Retardation). Despite her "limited intellectual level" and some emotional problems stemming from childhood abuse, Dr. Eckstein found that Ms. Schneider was coping with her problems and adequately providing for herself financially through her job at a fast food restaurant.

In 1995, Dr. Johnson again examined Ms. Schneider. In the report, which was also signed by Dr. George Middlekauff, the doctors found that Ms. Schneider suffered from Dysthymic Disorder;[2] Reading and Arithmetic Disorder; Borderline Intellectual Functioning; and Personality Disorder NOS with schizoid, avoidant, and dependant features.[3] After making this diagnosis, the doctors reached the following conclusion:

> As was true in 1992 when the undersigned saw Sharon Christy Schneider for a comprehensive psychological evaluation, results of the current evaluation suggests that Ms. Schneider does not evidence any major mental disorder which, in and of itself, would render Ms. Schneider sufficiently disabled ... so as to preclude her ability to maintain gainful competitive employment.
>
> With the foregoing said, it was the final impression of the undersigned that

Sharon Christy Schneider experiences a number of partially disabling psychological problems which interact synergistically so as to compound each other. Her Borderline Intellect, combined with her ongoing Dysthymic Disorder and Personality Disorder problems, combined with her probable continuing Reading and Arithmetic Disorder, appear to substantially incapacitate Ms. Schneider.

That same day, Dr. Middlekauff prepared a General Assistance Impairment Report in which he indicated that, based on her Borderline Intellect, Dysthymic Disorder, and Personality Disorder, Ms. Schneider was "unable to engage in any work activity" for "at least six to twelve months."

Finally, the record also includes a 1995 letter from Dr. Paul Bilder, a specialist in internal medicine and chest diseases. He stated that Ms. Schneider has bronchial asthma, mild allergies, and occasional musculoskeletal pain. He went on to state the following:

> I am not quite sure why she is being considered for disability. If it is for learning disability, perhaps an evaluation by a learning specialist might be helpful, but I suspect that she can work adequately in a clean environment if it doesn't take too much cognition. I suspect a specialist might be more appropriate for deciding if she would qualify for disability payments. I personally think that she can work at an appropriate job.

---

**2.** Dysthymic Disorder is a chronically depressed mood that occurs for most of the day, more days than not, for at least two years. *See Diagnostic and Statistical Manual of Mental Disorders* ("DSM–IV"), at 623 (4th ed.1994).

**3.** A Personality Disorder is an enduring pattern of inner experience and behavior that deviates markedly from the expectations of the individual's culture, is pervasive and inflexible, has an onset in adolescence or early adulthood, is stable over time, and leads to distress or impairment.

Schizoid features indicate a pattern of detachment from social relationships and a restricted range of emotional expression. Avoidant features suggest a pattern of social inhibition, feelings of inadequacy, and hypersensitivity to negative evaluation. Dependant features indicate a pattern of submissive and clinging behavior related to excessive need to be taken care of. *See DSM–IV*, at 629.

## B. Lay Evidence

In addition to the medical evidence, the record also contains a number of letters and evaluations from former employers, teachers, and friends. In 1993, Ms. Schneider was fired from her job as a laundry aide at Mercy Healthcare. In the termination report, her supervisor, Elaine Warwick, states that Ms. Schneider was fired because she could not work quickly enough and needed "constant supervision." Ms. Warwick explained that Ms. Schneider was unable to perform the responsibilities of her job without her supervisors or co-workers continually telling her what to do.

In April 1994, another friend and ex-employer, Ms. Margie Bengtson, wrote a letter discussing Ms. Schneider's limitations in the workplace. In the letter, Ms. Bengtson stated that she knew Ms. Schneider from teaching her special education classes, working with her on "functional life skills," and supervising her work study one semester. According to Ms. Bengtson, the combination of Ms. Schneider's learning disabilities, jaw deformity, and "inappropriate social interactions" made it difficult for her to "function within the workplace."

In June 1996, Ms. Rebecca Albjug filled out an employer questionnaire regarding Ms. Schneider's job performance as her baby-sitter. Ms. Albjug stated that she fired Ms. Schneider because she needed "a lot" of supervision and had "a lot of trouble accepting instructions and responding appropriately." Ms. Albjug also stated that Ms. Schneider often did not understand her tasks and instead of asking for clarification, would "lie to cover up . . . much like a 3rd or 4th grader." She thought that "a professionally trained person is the only person that she could work for" because she "drives everybody else crazy!"

In January 1997,[4] Jean Koenig, a personal friend and part-time employer, sub-mitted another letter on Ms. Schneider's behalf. Ms. Koenig stated that working with Ms. Schneider is "very time consuming." She explained that if a person wants Ms. Schneider to do something they have to explain it first and then walk her through it so that she can imitate the process. Ms. Koenig also noted that Ms. Schneider is very easily distracted. If there is another person around her, she will stop doing her task and either talk to the person or simply watch what they are doing. Ms. Koenig summarized her opinion as follows:

> Sharon does not have what it takes to be successful in the working world. Her needs are too difficult to deal with while trying to run a business. Her short attention span, inability to adjust to changing circumstances and her lack of understanding constructive criticism would get her fired every time.

Finally, in January 1997, a letter was submitted by Judy Lynn Rogers, another friend and part-time employer. Ms. Rogers first met Ms. Schneider when Ms. Schneider was assigned to work as her teacher's aide. Despite the "use of many strategies" over a three year period, Ms. Rogers determined that Ms. Schneider "was not competent enough to deal with school aged children." The reason was because she was "unable to adapt to any changes in routine" and was "not capable of transferring a learned skill to a new situation or setting." In addition, she was unable to "perform one task without going off in a different direction and losing sight of what the original job was."

Ms. Rogers witnessed similar problems when she hired Ms. Schneider to clean her home. She gave the following example to illustrate her point:

> When Sharon was shown how to thoroughly dust my bedroom furniture I left

---

4. At the hearing, the ALJ agreed to allow Ms. Schneider's attorney to supplement the record with additional letters. It appears from the record that two letters were submitted in January 1997, a few weeks after the December 1996 hearing, but well before the ALJ rendered his decision on March 28, 1997.

the room to cook dinner. After a large time lapse Sharon came out of the bedroom to tell me she had a surprise. I followed her back into the bedroom to see what the surprise was. Sharon started to dust, looked at the bed and decided to turn down the bed covers so all I had to do was climb into bed. Then in the bathroom, she applied toothpaste to the toothbrush and filled a cup with water. My bedclothes were laid on the bed and my clothes were out of the closet for the next day. The dusting was never completed but all the unnecessary extras were done. By doing the extras, Sharon over stepped her boundaries and could not comprehend what that meant. If I stayed right next to Sharon to keep her focused on the task at hand and with constant reminders, she was able to finish the job. She cannot differentiate between doing a specific job or doing the extras. She has selective attention problems which causes difficulty in focusing on centrally important tasks.

### C. The ALJ's Decision

The ALJ employed the five-step sequential process that governs SSI disability determinations. *See* 20 C.F.R. § 416.920. At step three of his analysis, the ALJ stated that "[n]o treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment." In reaching this conclusion, the ALJ did not discuss why he was rejecting the letters that Ms. Schneider's friends and ex-employers had submitted. Instead, he simply continued the sequential process and eventually concluded that, even though Ms. Schneider could *not* perform her past relevant work as a food service worker, she could perform other work such as an agricultural sorter, animal caretaker, child care attendant, and nursery worker. As a result, the ALJ ruled that Ms. Schneider was not disabled and was not entitled to SSI benefits.

The district court affirmed the ALJ's decision, and Ms. Schneider filed a timely notice of appeal.

## II. DISCUSSION

### A. Standard of Review

■ We reviews de novo the decision of the district court in an SSI case. *See Matney v. Sullivan,* 981 F.2d 1016, 1018 (9th Cir.1992). We may set aside the Commissioner's denial of benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole. *See Morgan v. Commissioner of Soc. Sec. Admin.,* 169 F.3d 595, 599 (9th Cir.1999). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* "Where the evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld." *Id.*

### B. Prior Application

■ As a threshold matter, we must first determine whether a presumption of nondisability has been created by two prior administrative rulings that found that Ms. Schneider was not disabled. In general, when the Commissioner has denied an earlier application by the claimant, his conclusion creates a presumption of nondisability. *See Hammock v. Bowen,* 879 F.2d 498, 501 (9th Cir.1989). The presumption can be overcome, however, when the claimant presents evidence of "changed circumstances." *Id.*

■ At her previous hearing (May 1994), Ms. Schneider submitted a 1992 psychological report from Dr. Basil Johnson. In the report, Dr. Johnson stated that, based on his interactions with Ms. Schneider, her mood appeared to be "mildly effectually blunted." Dr. Johnson also conducted a series of psychological tests which resulted in a Global Assessment of Functioning ("GAF") score of 70. Based on the interviews and tests, Dr. Johnson

concluded that Ms. Schneider "evidence[d] no gross or global intellectual impairment" and that her "psychological complications" did not incapacitate her or make her "unable to maintain herself in a socially acceptable and productive manner within the larger society."

By December 1995, however, Ms. Schneider's condition had changed. Two weeks before Ms. Schneider filed her most recent application, Dr. Johnson again examined Ms. Schneider. This time he found that Ms. Schneider's mood was "markedly effectually blunted." In addition, after further psychological testing, Dr. Johnson found that Ms. Schneider's GAF score had dropped to 60. Dr. Johnson also changed his diagnosis to include Dysthymic Disorder and Personality Disorder NOS with schizoid, avoidant, and dependant features. In his concluding remarks, Dr. Johnson stated that he now believed that Ms. Schneider was "substantially incapacitate[d]" and that she had a "marked disability in maintaining appropriate and expected social functioning." Given the changes in Ms. Schneider's test scores and diagnosis between 1992 and 1995, we find that Ms. Schneider has presented sufficient proof of "changed circumstances" to overcome the presumption that she is not disabled.

## C. Sequential Evaluation

■ Once the claimant overcomes the presumption of nondisability, she must then prove that she is in fact disabled. See Hammock, 879 F.2d at 501. A claimant is considered disabled if (1) she suffers from a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (2) the "impairment or impairments are of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(A), (B). If a claimant meets both requirements, she is "disabled."

The Social Security Regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act. See 20 C.F.R. § 416.920; Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir.1999). If a claimant is found to be "disabled" or "not disabled" at any step in the sequence, there is no need to consider subsequent steps. 20 C.F.R. § 416.920.

## D. Step Three—Lay Evidence

■ The primary issue that Ms. Schneider raises on appeal is that the ALJ erred at step three of the sequential process when he failed to consider five letters that Ms. Schneider's friends and ex-employers had submitted. Step three asks whether the claimant's impairment "meets or equals" one of a list of specific impairments described in 20 C.F.R. pt. 404, subpt. P., app. 1 ("The Listing"). When dealing with alleged mental disabilities, this inquiry has two parts. In the first part (Part A), the ALJ must determine whether there is evidence to "medically substantiate the presence of a mental disorder." Id. at § 12.00A. When making this initial determination, the ALJ can rely only on "medical evidence consisting of clinical signs, symptoms and/or laboratory or psychological test findings." Id. at § 12.00B.

In the second part (Part B), the ALJ must determine whether the "severity" of the claimant's "functional limitations" are "incompatible with the ability to work." Id. at § 12.00A. The ALJ makes this determination by ranking the severity of the claimant's deficiencies (e.g., none, slight, moderate, marked, extreme) in four different categories (e.g., daily living; social functioning; concentration, persistence, or pace; and episodes of deterioration in work). See id. at § 12.00C. If the ALJ ranks the claimant's limitations at the highest or second highest level (e.g., ex-

treme or marked) in two of the four categories, then the claimant satisfies Part B. *See, e.g., id.* at § 12.04B.

In this case, the ALJ made the required findings. In Part A, the ALJ found that there was sufficient medical evidence to establish that Ms. Schneider suffered from Dysthymia, Learning Disorder (reading and math), and Personality Disorder, and that these disorders satisfied the requirements of Part A. In Part B, the ALJ found that Ms. Schneider met the severity requirement in one category and narrowly missed in another. In the category dealing with "maintaining social functioning," the ALJ found that Ms. Schneider satisfied the severity requirement since her limitations in this category were "marked." However, in the category dealing with "deficiencies of concentration, persistence or pace," Ms. Schneider narrowly missed severity requirement since the ALJ found that this limitation only occurred "often." In order to satisfy this category, the ALJ would have had to find that Ms. Schneider's deficiencies occurred either "frequently" or "constantly." *Id.* at § 12.04B. Because Ms. Schneider failed to satisfy the severity requirement in two separate categories in Part B, the ALJ ruled that she was not disabled under the Listing.

In his written decision, the ALJ neither explained how he made his determination under Part B, nor made any mention of the five letters from Ms. Schneider's ex-employers and friends. When Ms. Schneider filed a complaint in the district court, one of her main arguments was that the ALJ erred when he failed to consider the letters in his Part B determination. The district court, however, rejected this argument based on its belief that the ALJ

could consider *only* medical evidence when making the Part B determination. This ruling is erroneous.[5]

The section of the federal regulations that deals with the Listing of Impairments explicitly explains what type of documentation the ALJ should use when making the Part A and Part B determinations. *See* 20 C.F.R. pt. 404, subpt. P., app. 1 § 12.00. The regulations state that, when determining whether a medical impairment exists under Part A, the ALJ can use "medical evidence" only. *Id.* at § 12.00B. When the ALJ moves on to Part B and attempts to rank the severity of the claimant's limitations, then the ALJ can utilize "[i]nformation from both medical and non-medical sources" including "work evaluations" and observations by people who "have knowledge of the individual's functioning." *Id.* at § 12.00D. Based on this language, both the ALJ and the district court erred when they failed to consider the letters from Ms. Schneider's friends and ex-employers.

### E. Substantial Evidence

◼ The government next argues that, even if the lay evidence is taken into consideration, the ALJ's decision is still supported by "substantial evidence." We disagree. In his Part B determination, the ALJ found that Ms. Schneider's deficiencies of concentration, persistence or pace "often" resulted in failing to complete tasks in a timely manner. He declined to check the box next to "frequent" or "constant," which would have resulted in a finding of disability. This ruling is not supported by substantial evidence.

5. In support of its ruling, the district court cited 20 C.F.R. § 404.1526 ("Medical Equivalences"), which states that the ALJ "will always base [his] decision about whether your impairment(s) is medically equal to a listed impairment *on medical evidence only.*" (Emphasis added). This section of the federal regulations, however, is inapplicable to this case. Section 404.1526 deals exclusively with a program known as "Federal Old–Age, Survivors and Disability Insurance." Ms. Schneider did not apply for, and is not eligible for, benefits under that program. Ms. Schneider applied for disability benefits under a different program—Supplemental Security Income ("SSI"). SSI is governed by 20 C.F.R. §§ 416.101–.2227. Thus, Section 404.1526 cannot support the district court's ruling.

Ms. Schneider submitted five different letters from friends and ex-employers who all stated that Ms. Schneider has problems with concentrating, cannot work quickly, requires "constant supervision," and cannot adapt to changes in routine. All the ex-employers also stated that she was unable to perform the responsibilities of her job without her supervisors or co-workers *continually* telling her what to do. Because of these problems, Ms. Schneider was fired from her jobs as a laundry worker, baby-sitter, teacher's aide, food service worker, and house cleaner. On the other side of the scale, the Commissioner has not cited any evidence to support his finding that Ms. Schneider has the ability to work at an adequate pace and that she does not need constant supervision. Viewing the record as a whole, the evidence is overwhelming that Ms. Schneider's "deficiencies of concentration, persistence or pace" have resulted in "frequent" or "constant" failure to complete tasks in a timely manner. As a result, the ALJ erred when he ruled that Ms. Schneider failed to "meet or equal" the Listing of Impairments in step three.

### F. Remand for Payment of Benefits

The final question is whether to remand for further administrative proceedings or simply for payment of benefits. "We may direct an award of benefits where the record has been fully developed and where further administrative proceedings would serve no useful purpose." *Smolen v. Chater,* 80 F.3d 1273, 1292 (9th Cir.1996).

Here, the record is fully developed and additional proceedings would not be helpful. When the lay evidence that the ALJ rejected is given the effect required by the federal regulations, it becomes clear that the severity of Ms. Schneider's functional limitations is sufficient to meet or equal Listing § 12.04. As a result, we reverse and remand for payment of benefits. *See Lester v. Chater,* 81 F.3d 821, 834 (9th Cir.1995) (stating that, when evidence that

was improperly rejected demonstrates that the claimant meets or equals the Listing, then the court should remand for payment of benefits); *Smolen,* 80 F.3d at 1292 (same); *Ramirez v. Shalala,* 8 F.3d 1449, 1455 (9th Cir.1993) (same).

### III. CONCLUSION

The judgment of the district court is REVERSED. The case is REMANDED to the district court with directions to order the payment of benefits to Ms. Schneider.