Lazaro VALDIVIA–RAMOS, Plaintiff,

v.

Joanne B. BARNHART, Commissioner
of Social Security, Defendant.

No. CIV. 03–177–TC.

United States District Court,
D. Oregon.

July 23, 2004.

912

Alan Stuart Graf, Alan Stuart Graf, PC, Amy K. Van Horn, Alan Graf, P.C., Portland, ME, for Lazaro Valdivia–Ramos, Plaintiff.

Craig J. Casey, United States Attorney's Office, Portland, ME, Lucille G. Meis, Social Security Administration, Office of the General Counsel, David M. Blume, Social Security Administration, Leisa A. Wolf, Social Security Administration, Office of General Counsel, Seattle, WA, for Commissioner of Social Security Administration, Defendant.

## ORDER

AIKEN, District Judge.

Magistrate Judge Coffin filed his Findings and Recommendation on June 28, 2004. The matter is now before me. *See* 28 U.S.C. § 636(b)(1)(B) and Fed.R.Civ.P. 72(b). No objections have been timely filed. This relieves me of my obligation to give the factual findings *de novo* review. *Lorin Corp. v. Goto & Co., Ltd.,* 700 F.2d

1202, 1206 (8th Cir.1982). *See also Britt v. Simi Valley Unified School Dist.,* 708 F.2d 452, 454 (9th Cir.1983). Having reviewed the legal principles *de novo,* I find no error.

THEREFORE, IT IS HEREBY OR- DERED that, I adopt Judge Coffin's Find- ings and Recommendation.

## FINDINGS AND RECOMMENDATION

COFFIN, United States Magistrate Judge.

### INTRODUCTION

Plaintiff Lazaro Valdivia–Ramos brings this action pursuant to the Social Security Act, 42 U.S.C. § 405(g) (the Act), to obtain judicial review of a final decision of the Commissioner of the Social Security Ad- ministration (Commissioner) denying his request for Social Security Supplemental Security Income (SSI). For the reasons set forth below, I recommend the Commis- sioner's decision be reversed and remand- ed for an award of benefits pursuant to Sentence Four of 42 U.S.C. § 405(g).

### PROCEDURAL BACKGROUND

Valdivia–Ramos filed applications for SSI on February 26, 1990, October 3, 1990, June 17, 1993, and July 7, 1998. He was denied each time and did not appeal. The present application was filed on January 12, 2001, and alleges disability due to a combination of impairments, including dia- betes, hypothyroidism, obstructive sleep apnea, hypertension, depression, border- line and antisocial personality disorders, and obesity. That application was denied initially and on reconsideration. In a deci- sion issued August 5, 2002, an Administra- tive Law Judge (ALJ) found Valdivia–Ra- mos was not entitled to benefits. The Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. Valdi- via–Ramos now seeks judicial review of the Commissioner's decision.

### STANDARDS

■■■ A claimant is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impair- ment which ... has lasted or can be ex- pected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The initial burden of proof rests upon the claimant to establish his or her disability. *Roberts v. Shalala,* 66 F.3d 179, 182 (9th Cir.1995), *cert. denied,* 517 U.S. 1122, 116 S.Ct. 1356, 134 L.Ed.2d 524 (1996). The Commissioner bears the bur- den of developing the record. *DeLorme v. Sullivan,* 924 F.2d 841, 849 (9th Cir.1991).

■■■ The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); *see also Andrews v. Shalala,* 53 F.3d 1035, 1039 (9th Cir.1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might ac- cept as adequate to support a conclusion." *Andrews,* 53 F.3d at 1039. The court must weigh all of the evidence, whether it sup- ports or detracts from the Commissioner's decision. *Martinez v. Heckler,* 807 F.2d 771, 772 (9th Cir.1986). The Commission- er's decision must be upheld, however, even if "the evidence is susceptible to more than one rational interpretation." *An- drews,* 53 F.3d at 1039–40.

### STATEMENT OF FACTS

I. *Testimony of Valdivia–Ramos*

Valdivia–Ramos is a Cuban citizen. His testimony was facilitated by an interpret-

er. Born on December 8, 1961, he was 40 years old at the time of the last hearing. He entered the United States in 1980 as part of the Freedom Flotilla from Cuba, and is a permanent legal alien under an "Order of Supervision" issued by the U.S. Immigration and Naturalization Service (INS) in November 1986.

When asked whether he understood English, Valdivia–Ramos testified that he could "understand many things, but I cannot understand everything." He stated that as of May 1990, he "could not understand almost anything." His English has improved a little bit in the last ten years. In May 1990 he could not read or write English.

He does not recall receiving a notice of denial when he first applied for SSI. He was homeless, and when he applied for welfare he was told to apply for SSI. He had no place to receive mail.

Valdivia–Ramos stated that he applied a second time for SSI because he didn't have a job, he spoke no English, and he was tired all the time. He got "very upset" because "they were sending me from here to there, one place to another." He was sent to a doctor, and then nothing else happened.

He was in custody in 1986 when his thyroid gland was removed. Valdivia–Ramos testified that that is when his problems started because he would tire easily and could not keep a job because he could not work.

He completed first grade in Cuba. He could go no farther because "they were giving me some medication because I used to forget things very easily, and I couldn't learn things. I forgot everything." He can read some Spanish, but cannot write very well. He cannot write in English.

Valdivia–Ramos was employed as a maintenance worker for 16 months in 1991–1992. His employer said he was a good worker, but let him go because he could no longer squat down, bend over, and reach down a lot.

## II. Medical and Other Records

In June 1980, Valdivia–Ramos reported to the INS that he had been detained in an "insane asylum" three times, and incarcerated from 1970 to 1980 for stealing food. In August 1980, he was arrested for assaulting a federal officer and rioting at the detention center.

Valdivia–Ramos, in a sworn statement to the INS in October 1980, said he had been epileptic since age eight, and that he had been detained in a mental hospital as a child for a year and a half.

In December 1980, while detained with other Cuban refugees, Valdivia–Ramos assaulted another detainee with a knife. In February 1981, he lit the bedding in his cell on fire because he thought he was having a nervous breakdown and needed an operation on his neck. In July 1981, he threatened to cut his cellmate with a piece of sharpened metal unless he was moved to another cell.

Manuel O. Garcia, M.D. completed a psychiatric evaluation of Valdivia–Ramos in July 1981. Valdivia–Ramos told Dr. Garcia that he felt ostracized from the other inmates and made knives in order to defend himself. He had stabbed himself in the arm in order to go to the hospital. He stated that if he stayed in the interment camp too long "he would end up killing someone." His parents were first cousins, and his father beat him severely. At age 14 he had spent six months in a reformatory.

Dr. Garcia found that Valdivia–Ramos had a "diffusively" enlarged thyroid gland. He thought Valdivia–Ramos was hostile, depressed and angry, with an intense and

constricted affect. He was preoccupied by the belief that people were going to attack him. Dr. Garcia assessed an Axis I adjustment reaction with mixed disturbance of emotions and conduct, and Axis II borderline personality disorder with paranoid traits. He concluded:

> I feel patient is a severely disturbed person, who poses a danger to himself and to others. His personality requires intense treatment in a very structured setting, possibly the need of some phenothyacins [sic] (a group of tranquilizing medications with antipsychotic action). He seems to go through period [sic] of many psychotic decompensations, including the experiencing of hallucinations and intense paranoia. I believe his criminal record can be understood in the light of a severe personality disorder. His prognosis is reserved.

> His thyroid functioning must be assessed and properly treated, since thyroid dysfunction can facilitate abnormal behavior.

In December 1982 Valdivia–Ramos underwent another psychiatric evaluation, by Paul Lapinel. M.D. He told Dr. Lapinel that he had been in a homosexual relationship from age twelve to fourteen with a man twelve years his senior. Valdivia–Ramos said that he had been imprisoned in Cuba from 1975 until he came to the United States in 1980. Dr. Lapinel diagnosed an Axis II antisocial personality disorder.

In October 1986, the INS concluded that Valdivia–Ramos was excludable because he had a mental disorder.

In February 1990, Valdivia–Ramos filed his first application for SSI benefits.

In July 1990, Valdivia–Ramos sought information from INS, stating that he was sick and needed medical attention.

In October 1990, Valdivia–Ramos filed his second application for SSI benefits. He filed a third application in June 1993.

The transcript contains no medical records for the period from 1990 through early 1998. In March 1998 Valdivia–Ramos was hospitalized overnight, complaining of increasing swelling of the lower extremities, periorbital swelling, and weakness. He reported depression and a history of hypothyroidism. He had not taken his thyroid medication for three months because of lack of resources. Doctors noted that his last hospital admission had been in December 1996, with the same symptoms. Valdivia–Ramos was 5'6" and weighed over 340 pounds.

In June 1998, Valdivia–Ramos was admitted to the hospital with chronic shortness of breath, progressively worse. On discharge, he was diagnosed with congestive heart failure, probable obstructive sleep apnea, obesity hypoventilation syndrome, severe hypothyroidism, and obesity.

In May 2000, treating physician James Bartruff, M.D., wrote:

> [Plaintiff] suffers from obstructive sleep apnea, morbid obesity hypothyroidism (profound) and left knee arthritis, the combination of which makes him completely disabled. He has been this way since at least 1998.

In June 2002, treating physician Patricia Kullberg, M.D. wrote:

> Chronic hypoxia [oxygen deficiency] causes strain to the heart. This is a process that generally develops over years. The medical findings, as reported in the medical records from June 1988[sic], are entirely consistent with the onset of hypoxia prior to August, 1996. In fact, it is highly unlikely that his problems in 1988[sic] were of recent onset. Once sleep apnea is severe

enough to cause oxygen desaturation, the patient is usually disabled by fatigue and daytime sleepiness because of chronic sleep deprivation. Such patients usually suffer from decreased alertness and concentration and depressed mood. Tr. 561.

In July 2002, at the request of plaintiff's counsel, Eric Dover, M.D., reviewed plaintiff's medical record. Dr. Dover found that Valdivia–Ramos suffers from an underlying psychological disease which began years or decades before 1996. He opined that plaintiff's "history of criminal behavior, noncompliance, and self abuse are all outward signs of underlying psychological disorders that would have made him an undependable worker." Tr. 795.

Dr. Dover wrote:

[Plaintiff] has had hypothyroidism and morbid obesity predating August of 1996. Even though I have essentially no medical records prior to 1998, the fact that he had morbid obesity and was noncompliant with his hypothyroidism treatment means he was most certainly dealing with diabetes mellitus, hypertension and sleep apnea. These problems do not typically occur suddenly, but in most instances have been ongoing for years prior to recognition and treatment. By June of 1998 they were full blown (see 6/98 hospitalization) and creating life threatening situations for Mr. Valdivia. Therefore, these medical problems were present prior to August 1, 1996. *Id.*

Dr. Dover noted that a 1996 echocardiogram revealed borderline heart function at rest, and Dr. Dover opined that functioning with any exertion would have been lower. By 1998, plaintiff's heart had deteriorated "markedly," and revealed "excessively severe heart disease." Dr. Dover called the combination of ailments "severe-ly life threatening." Tr. 795–96. Dr. Dover concluded:

Therefore, prior to August 1st of 1996, we can conclude that Mr. Valdivia had at best borderline heart function at rest, severe sleep apnea, uncontrolled hypothyroidism, morbid obesity, and untreated diabetes mellitus, congestive heart failure, peripheral and pulmonary hypertension and psychiatric illness. With these disease processes and his heavy cigarette smoking you can conclude he probably also had some degree of coronary artery disease and respiratory problems. He would have been unable to perform full time sedentary work. The severe sleep apnea and hypothyroidism would have rendered him unable to concentrate, stay on task or be productive. His energy level would have been very limited and he would have missed a lot of work secondary to his multitude of debilitating illnesses. Basic hygiene would have been difficult at best. Tr. 796.

### III. *The ALJ's Decision*

The ALJ determined that Valdivia–Ramos is not a United States citizen, and is not eligible for SSI payments as a resident alien under the Work Opportunity Reconciliation Act of August 22, 1996. He found that Valdivia–Ramos's prior applications for SSI filed in 1990 and 1993 may not be reopened under 20 C.F.R. 416.1488, or under Social Security Ruling 91–5p, or under Social Security Acquiescence Ruling 92–7(9).

Finally, the ALJ found that Valdivia–Ramos was not eligible for or receiving SSI benefits on August 22, 1996, and therefore was not eligible to be "grandfathered" under the provisions of the Balanced Budget Act of 1997.

*DISCUSSION*

Plaintiff contends that the ALJ erred by failing to find that good cause exists to reopen his 1990 and 1993 applications for benefits. Valdivia–Ramos argues that he lacked the mental capacity to understand the procedures for requesting review, and that therefore good cause exists to reopen the applications and the time limits for requesting review do not apply.

## I. *Good Cause Exists to Reopen Past Applications*

■ SSR 91–5p provides that a claimant may establish good cause to warrant reopening a previously denied application for benefits by proving that his or her mental incapacity prevented the making of a timely request for review of an adverse determination, and that the claimant had no legal representation at the time. An adjudicator must consider four factors to determine if a claimant has shown good cause to reopen an application due to a lack of mental capacity: 1) inability to read or write; 2) lack of facility with the English language; 3) limited education; and 4) any mental or physical condition which limits the claimant's ability to do things for him or her self. The factors must be considered as they existed at the time of the prior administrative action. "The adjudicator will resolve any reasonable doubt in favor of the claimant." SSR 91–5p.

■ The ALJ found that Valdivia–Ramos failed to establish that a mental impairment prevented him from understanding his right to request reconsideration of his 1990 and 1993 claims. He stated:

> The documentary reports and testimony reveal he is able to read and has at least some ability to communicate in English. ...Mr. Valdivia submitted INS documents that reveal he was among many detainees from the Freedom Flotilla involved in violent behavior during deten-sion [sic] in 1980 and 1981. He was considered a difficult detainee and described past hallucinatory experiences to INS evaluators. However, psychiatric evaluations in July 1981 and December 1982 revealed he was not suffering from major mental illness and no Axis I diagnosis was made. INS investigations revealed his behavior during detention stemmed largely from the unstable conditions in the detention camp during initial months and his refusal to participate in a riot. He was diagnosed with personality disorders primarily due to his history of antisocial behavior, but he subsequently impressed authorities with his quiet demeanor and hard work during the last 13 months of his detention. The review report noted: "He corresponds with his family. He likes to read. He is willing to do farm work, construction work (can operate a jackhammer). He has attained an English certificate." (Exhibit 4D/167). There is no indication Mr. Valdivia has suffered symptoms of mental illness since 1981. Treatment reports of record (from 1998 through June 2000) reveal Mr. Valdivia has required treatment for severe physical impairments but has not complained of or been diagnosed with mental illness. Complaints of depressed mood noted in June 2002 were related to his physical illness.

Mr. Valdivia testified that he does not remember receiving the notices of determinations in 1990 or 1993. He said he applied for benefits because he was required to do so by welfare authorities in California and Illinois in order to receive public assistance benefits. He said he probably did not receive the notices because he moved on before they were sent.

Mr. Valdivia's testimony reveals he applied for SSI benefits in 1990 and 1993

only because he was required to do so in order to receive State public assistance payments. He was in contact with State social workers who would have provided assistance in understanding his rights and pursuing reconsideration. He did not request reconsideration because he had satisfied the State requirements by applying for SSI and was not required to request reconsideration. He was not interested in pursuing the claim and moved on without waiting for the determination notice. Tr. 19–20.

### A. *Ability to Read and Write*

The ALJ found that Valdivia "is able to read and has at least some ability to communicate in English." Tr. 19. He noted an INS report that Valdivia liked to read, corresponded with his family and obtained an English certificate.

However, Valdivia testified that in 1990 he could neither read nor write in English. In 2002 the Administration provided an interpreter to translate for Valdivia. There is nothing in the record to indicate what an "English certificate" means. There is no evidence that Valdivia–Ramso can write in English. Moreover, Valdivia's language difficulties were probably not relevant to his failure to request review as he probably never received the notices due to his homelessness.

The ALJ's finding that Valdivia–Ramos is able to communicate in English and read is not relevant to the time period in question and is not supported by substantial evidence.

### B. *Lack of Facility with the English Language*

Valdivia–Ramos testified that in 1990 "I could understand almost no English." Tr. 59. There is no substantial evidence to the contrary.

### C. *Limited Education*

The ALJ did not consider this factor in his evaluation of the evidence. The evidence shows that Valdivia–Ramos completed the first grade in Cuba.

### D. *Mental or Physical Condition Which Limits the Claimant's Ability to Function*

The ALJ found that there was "no indication that Mr. Valdivia has suffered symptoms of mental illness since 1981." However, in 1981 Dr. Garcia diagnosed an Axis I adjustment reaction with mixed disturbance of emotions and conduct, and Axis II borderline personality disorder with paranoid traits. In October 1986, the INS concluded that Valdivia–Ramos was excludable due to a mental disorder. In December 1992 Dr. Lapinel diagnosed an Axis II antisocial personality disorder. In July 2002, Dr. Dover opined that Valdivia–Ramos had suffered from "psychological disease"... "for years, if not decades, prior to August of 1996." Tr. 795. Accordingly, the ALJ's conclusion regarding plaintiff's mental condition is not supported by substantial evidence.

The ALJ noted that plaintiff "applied for benefits because he was required to do so by welfare authorities...." But, Valdivia–Ramos testified that he filed his second application, "Well at that time I didn't have a job. I couldn't find a job because I spoke no English. So I needed help, so I went to apply, because I was disabled. I was tired all the time." Tr. 62. The ALJ's conclusion that Valdivia–Ramos filed only in order to qualify for welfare benefits is not supported by substantial evidence.

The ALJ's determination that Valdivia–Ramos has not shown good cause to reopen previously denied applications is not supported by substantial evidence.

## II. *Remand for Payment of Benefits is Appropriate*

■ The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir.), *cert. denied*, 531 U.S. 1038, 121 S.Ct. 628, 148 L.Ed.2d 537 (2000). The court's decision turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is not sufficient to support the Commissioner's decision. *Rodriguez v. Bowen*, 876 F.2d 759, 763 (9th Cir.1989).

■ The Ninth Circuit has established a three-part test "for determining when evidence should be credited and an immediate award of benefits directed." *Harman v. Apfel*, 211 F.3d at 1178. The court should grant an immediate award of benefits when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Id.* The second and third prongs of the test often merge into a single question: Whether the ALJ would have to award benefits if the case were remanded for further proceedings. *See id.* at 1178 n. 2.

■ The Commissioner argues that this matter should be remanded to obtain updated and clarifying medical statements. She contends that the delay in resolution "has not been excessive by Agency standards." However, Valdivia–Ramos filed his first application for SSI benefits in February 1990.

Treating physician Kullberg opined that Valdivia–Ramos was suffering from hypoxia prior to August 1996. Treating physician Bartruff opined that Valdivia–Ramos had been completely disabled since at least 1998. Reviewing physician Dover concluded that prior to August 1996, Valdivia–Ramos suffered hypothyroidism, morbid obesity, diabetes mellitus, hypertension, sleep apnea, and borderline heart functioning. If credited, Dr. Kullberg's testimony, coupled with the testimony of Dr. Dover, establishes that Valdivia–Ramos could not work on a regular and sustained full-time basis as of August, 1996, and therefore he is disabled. The court, therefore, concludes that this matter should not be remanded for further proceedings. *See Schneider v. Comm'r*, 223 F.3d 968 (9th Cir.2000). *See also Reddick v. Chater*, 157 F.3d 715, 729 (9th Cir.1998)("We do not remand this case for further proceedings because it is clear from the administrative record that Claimant is entitled to benefits.")

Accordingly, this matter should be remanded for the purpose of permitting the Commissioner to calculate and to award benefits to Valdivia–Ramos as of August 1, 1996.

### RECOMMENDATION

For these reasons, the Commissioner's decision should be REVERSED and REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for calculation and award of benefits as of August 1, 1996.