**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MICKEY C. WEBB,
            *Plaintiff-Appellant,*

v.

JO ANNE B. BARNHART,
COMMISSIONER, SOCIAL SECURITY
ADMINISTRATION,
            *Defendant-Appellee.*

No. 04-35445

D.C. No.
CV-03-00015-AA

OPINION

Appeal from the United States District Court
for the District of Oregon
Ann L. Aiken, District Judge, Presiding

Argued and Submitted
September 16, 2005—Portland, Oregon

Filed December 29, 2005

Before: Raymond C. Fisher, Ronald M. Gould and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Fisher;
Dissent by Judge Bea

**COUNSEL**

Linda S. Ziskin, Lake Oswego, Oregon, for the plaintiff-appellant.

David M. Blume, Office of the General Counsel, Social Security Administration, Seattle, Washington, for the defendant-appellee.

---

**OPINION**

FISHER, Circuit Judge:

Mickey C. Webb appeals the district court's summary judgment affirmance of the Commissioner of Social Security's final decision denying him disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-33. On appeal, Webb contends that the administrative law judge ("ALJ") improperly found him to be not disabled at the second step of the five-step evaluative process, and that substantial evidence did not support the ALJ's finding that Webb's impairments were not medically severe. We agree and reverse.

**I.**

In 1987, at the age of 35, Webb had his torso partially crushed in an all-terrain vehicle accident. He suffered several broken ribs and internal injuries and was hospitalized for a week. Two years later, he collapsed at his job as a retail manager and was taken to the emergency room, where he was found to have elevated blood pressure. In 1991, Webb experienced visual disturbances and memory loss; he underwent a CAT scan, but its results were normal. Then, in 1994, he began to have acute back pain that his doctor traced to the ATV accident and a workplace injury in 1982 or 1983.

During the next several years, Webb continued to suffer from lower back pain and hypertension. He went on and off a variety of medications. Although some had positive results, their side effects were often intolerable. Because of his ailments and the side effects of their treatment, Webb stopped working.

Although there are gaps in Webb's treatment history, the record before the ALJ included doctors' reports and other medical evidence documenting his problems. X-rays taken in 1994 showed "disc space narrowing" in his lower back. A doctor's report stated that "[d]egenerative disc disease [wa]s suspected." In 1995, after attempting to help a friend build a garage door, Webb experienced severe hip pain; a clinical report indicated that he endured similar hardship prior to that "after getting in and out of small cars." In 1996, he also began to have knee pain. Doctors' reports from that year reported "tissue swelling" in Webb's left knee and "some degenerative changes medially and some minimal patellar spurring." Throughout this period, Webb's back problems appear to have been constant. His other conditions grew better or became worse in correspondence with his ability to endure the side effects of his therapeutic regimen.

In 2000, Webb filed an application for disability insurance benefits in which he alleged disability since 1991 due to back pain, high blood pressure, memory loss, arm pain, weakness and lack of sleep. Although Webb presented evidence of his problems after 1997, his insurance coverage expired in that year. The relevant period for the purpose of assessing his disability status, therefore, is prior to 1997. In 2002, after a hearing, the ALJ found Webb not to be disabled. When the Appeals Council denied Webb's request for review, the ALJ's decision became the final agency decision for purposes of this appeal. Pursuant to 42 U.S.C. § 405(g), Webb sought judicial review of the Commissioner's final decision in the district court, which affirmed the ALJ. He appeals that judgment. We

have jurisdiction to hear Webb's appeal under 28 U.S.C. § 1291.

## II.

We review the district court's order affirming the Commissioner's denial of benefits de novo. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996). We uphold the Commissioner's decision denying benefits if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision. *Hoffman v. Heckler*, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

## III.

A. *Relevant Legal Framework*

[1] The Social Security Act defines disability as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant bears the burden of establishing disability under the Act. *Tacket v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). To determine whether a claimant has established disability, an ALJ must evaluate the evidence adduced by following a five-step, sequential analysis. 20 C.F.R. § 404.1520.

[2] At step one, the ALJ examines whether the claimant is engaged in substantial gainful employment activity. *Id.* § 404.1520(a)(4)(i). At step two, the ALJ assesses whether the claimant has a medically severe impairment or combination of impairments that significantly limits his ability to do basic work activities. *Id.* § 404.1520(a)(4)(ii). The "ability to do

basic work activities" is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). For purposes of Webb's petition, the most relevant activities include the ability to perform "physical functions such as walking, sitting, lifting, pushing, pulling, reaching, carrying, or handling." *Id.* An impairment is not severe if it is merely "a slight abnormality (or combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities." S.S.R. No. 96-3(p) (1996). If the ALJ finds that the claimant lacks a medically severe impairment, the ALJ must find the claimant not to be disabled. However, if the ALJ concludes that the claimant does have a medically severe impairment, the ALJ proceeds to the next steps in the sequence.

Steps three through five require the ALJ to evaluate whether the claimant's impairment satisfies certain statutory requirements entitling him to a disability finding. If the impairment does not, the ALJ must assess whether the claimant remains capable of doing his prior work or engaging in alternative employment. 20 C.F.R. § 404.1520(a)(4)(iii)-(v).

B.  *Findings by the ALJ*

In assessing Webb's petition, the ALJ first determined that Webb was not engaged in any gainful employment activity. At step two, the ALJ found that Webb did not have a medically severe impairment or combination of impairments prior to the lapse in his insurance coverage in 1997. Having made that finding, the ALJ ended his inquiry because there was no way that Webb could prove he was disabled within the meaning of the Act. It is this preemptive finding that Webb challenges.

[3] An impairment or combination of impairments may be found "not severe *only if* the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work." *Smolen*, 80 F.3d at 1290 (inter-

nal quotation marks omitted) (emphasis added); *see Yuckert v. Bowen*, 841 F.2d 303, 306 (9th Cir. 1988). The Commissioner has stated that "[i]f an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation should not end with the not severe evaluation step." S.S.R. No. 85-28 (1985). Step two, then, is "a de minimis screening device [used] to dispose of groundless claims," *Smolen*, 80 F.3d at 1290, and an ALJ may find that a claimant lacks a medically severe impairment or combination of impairments only when his conclusion is "clearly established by medical evidence." S.S.R. 85-28. Thus, applying our normal standard of review to the requirements of step two, we must determine whether the ALJ had substantial evidence to find that the medical evidence clearly established that Webb did not have a medically severe impairment or combination of impairments. *See also Yuckert*, 841 F.2d at 306 ("Despite the deference usually accorded to the Secretary's application of regulations, numerous appellate courts have imposed a narrow construction upon the severity regulation applied here.").

**[4]** In this case, the ALJ found that Webb lacked a medically severe impairment or combination of impairments despite objective medical evidence demonstrating back pain, hypertension, knee pain, hip pain, visual disturbances, memory loss, diverticulitis, lack of sleep, difficulty performing physical tasks and lack of employment from 1991 through 1997. Although the medical record paints an incomplete picture of Webb's overall health during the relevant period, it includes evidence of problems sufficient to pass the de minimis threshold of step two. *See Smolen*, 80 F.3d at 1290. And although Webb ultimately bears the burden of establishing his disability, *see Bowen*, 482 U.S. at 146, the ALJ had an affirmative duty to supplement Webb's medical record, to the extent it was incomplete, before rejecting Webb's petition at so early a stage in the analysis. *See* 20 C.F.R. § 404.1512(e)(1); S.S.R. 96-5p (1996). "In Social Security

cases the ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983) (per curiam). The ALJ's duty to supplement a claimant's record is triggered by ambiguous evidence, the ALJ's own finding that the record is inadequate or the ALJ's reliance on an expert's conclusion that the evidence is ambiguous. *See Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001). Here, the medical evidence was sufficiently ambiguous to trigger the ALJ's duty because of the obvious vicissitudes in Webb's health, particularly the ways in which his conditions improved and worsened as a result of the afflictions and their treatments.

**[5]** Moreover, on the record that does exist, the ALJ's reasons for rejecting Webb's complaints at step two are not substantial enough to meet the "clear and convincing" standard when balanced against Webb's doctors' contemporaneous observations, some objective tests and Webb's subjective complaints. *See Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) ("Unless there is affirmative evidence showing that the claimant is malingering, the Commissioner's reasons for rejecting the claimant's testimony must be clear and convincing.") (internal citation and quotation marks omitted). The ALJ found that Webb's "subjective complaints" and "assertions regarding the disabling extent of his functional limitations . . . [we]re exaggerated, and not credible" because Webb was not under constant treatment, Webb was capable of performing household tasks and Webb sought employment during the relevant period. However, the medical record indicates that Webb's effort to have his hypertension treated often resulted in new afflictions and complications due to the deleterious side effects of his medication. The record also includes x-rays showing "disc space narrowing" in his lower back and his doctor's opinion that Webb may have suffered from "degenerative" back conditions and "disc fragmentation or significant herniation." That Webb sought employment suggests no more than that he was doing his utmost, in spite of his health,

to support himself.[1] "The mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from [his] credibility as to [his] overall disability. One does not need to be 'utterly incapacitated' in order to be disabled." *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001) (internal citation omitted).

The ALJ also viewed Webb's objective medical evidence simply as part of "the claimant's subjective complaints" when finding Webb's assertions to be "exaggerated, and not credible." Credibility determinations do bear on evaluations of medical evidence when an ALJ is presented with conflicting medical opinions or inconsistency between a claimant's subjective complaints and his diagnosed conditions. *See, e.g., Batson v. Comm'r of Soc. Sec. Adm'n*, 359 F.3d 1190, 1195 (9th Cir. 2004). But there is no inconsistency between Webb's complaints and his doctors' diagnoses sufficient to doom his claim as groundless under the de minimis standard of step two. Webb's clinical records did not merely record the complaints he made to his physicians, nor did his physicians dismiss Webb's complaints as altogether unfounded. To the contrary, the doctors' reports and test results usually corresponded with the afflictions Webb perceived, particularly his hypertension, the side effects of his treatment and the interaction of some drugs (his pain killers) with others (his hypertension medication) in his therapeutic regimen. There is not, in

---

[1]The ALJ determined that the record depicted "a pattern of only transitory and intermittent medical conditions rather than any chronic condition which would produce significant work-related restrictions." Webb might not have suffered from a single, chronic condition during the relevant period, but he has submitted evidence of a combination of impairments that, on this record, appears to have prevented him from engaging in gainful activity on a sustained basis. *See* 20 C.F.R. § 404.1512(a). In *Gatliff v. Com. of Soc. Sec.*, 172 F.3d 690, 691 (9th Cir. 1999), we held that "[s]ubstantial gainful employment cannot be pieced together from a collection of insubstantial attempts" like Webb's vain efforts between 1991 and 1997.

this instance, the total absence of objective evidence of severe medical impairment such as was the case in *Ukolov v. Barnhart*, 420 F.3d 1002 (9th Cir. 2005), where we affirmed a finding of no disability at step two when even the claimant's doctor was hesitant to conclude that any of the claimant's symptoms and complaints were medically legitimate. *Id.* at 1006.

**[6]** We do not intimate that Webb will succeed in proving that he is disabled and entitled to disability insurance benefits. But we do hold that the ALJ lacked substantial evidence to find that the medical evidence clearly established Webb's lack of a medically severe impairment or combination of impairments. The ALJ should have continued the sequential analysis beyond step two because there was not substantial evidence to show that Webb's claim was "groundless." *See Smolen*, 80 F.3d at 1290.

**REVERSED** and **REMANDED**.

---

BEA, Circuit Judge, dissenting:

We review the district court's judgment *de novo* to determine whether the administrative law judge's (ALJ's) decision is supported by substantial evidence in the record as a whole and applies the correct legal standards. *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir 2001). Substantial evidence is such relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Id*. The ALJ's findings must be upheld if they are supported by inferences reasonably drawn from the record. *Id*. If evidence exists to support more than one rational interpretation, this court must defer to the ALJ's decision. *Id*. Because a thorough review of Mickey Webb's medical records shows that there is substantial evidence to support the ALJ's determination that Webb did not

suffer from a severe impairment during the relevant period, I respectfully dissent.

## I.

In June 1987 Webb was involved in an ATV accident that resulted in multiple rib fractures and possible facial injures. X-rays of the thoracic and cervical spines taken at the time were "essentially unremarkable." There is no evidence of further medical treatment, to such spines or otherwise, until August 1989 when Webb sought emergency room treatment for weakness and numbness in his left arm. Webb reported that he had felt weak for a number of years. The examining physician determined that the symptoms were caused either by stress or hypertension and recommended that Webb eat breakfast and lunch (which he had not done that day). Webb continued to maintain steady employment following the ATV injury until 1991.[1]

In October 1991, Webb reported visual disturbance and memory loss. A CT scan of the brain revealed "no evidence of hypertensive bleed or other intraparenchymal [organ tissue] abnormalities."

On April 9, 1992, Webb reported to Dr. Donnelly that he had been doing quite well and had no problems with headaches or visual discomfort or transient ischemic attack symptoms[2] since his blood pressure had been under control. Dr. Donnelly noted, "evidently he quit his job as he was just kind of 'puttering around.' " Webb's hypertension was also "under good control."

---

[1]Webb's alleged onset date of disability is August 1, 1991, when he stopped working.

[2]A brief episode of cerebral ischemia (deficient supply of blood to the brain) that is usually characterized by temporary blurring of vision, slurring of speech, numbness, or paralysis.

On December 7, 1993, Webb sought medical treatment after a foreign body hit his right eye while he was working with a table saw.[3] In October 1994, Webb was treated for lower back pain. It was noted that Webb had discontinued his hypertension medication in April 1992 due to fatigue, but had not gone to see a doctor since then. Dr. Naymik noted that Webb's hypertension was "poorly controlled" and prescribed Dilacor (hypertension medication) and Relafen (pain medication). A chest x-ray was within normal limits with poor resolution of the thoracic vertebrae, and an electrocardiogram (EKG) was also normal.

On November 7, 1994, Webb reported that he was feeling better with regard to his upper extremity pain, neck pain, and blood pressure, and now wanted to "deal with his low back pain." Webb traced his back problems to a 1983 work injury, rather than the 1987 ATV accident, but explained that he had not sought care since that time despite recurrent episodes of back pain. Webb explained that his back "[gave] way" sometimes if he stood in one place and he occasionally fell down.

The "clinical sheet" prepared by Dr. Naymik notes that Webb's blood pressure was "much improved" and that Webb was to continue taking Relafen and Dilacor daily. Webb's left shoulder, arm and mid-thoracic back pain symptoms had improved with anti-inflammatory medications. Dr. Naymik further noted that Webb's "[b]ack is straight to palpation. Deep tendon reflexes are symmetrical. Straight leg raising is negative. Upper extremity left arm deep tendon reflexes are good." An x-ray of the lower back "demonstrated disc space narrowing at L4-L5" and Dr. Naymik suspected degenerative disease. Dr. Naymik advised Webb to "continue to protect his lower back and to do appropriate low back exercises." He also suggested Webb consider an MRI scan and/or neurosurgical

---

[3]A small metallic foreign object was removed and he was discharged "in good condition." Webb does not allege any change in his vision resulting from this injury.

evaluation to check for "disc fragmentation or significant herniation at the L4-L5 level" but Webb said he needed to think it over.

On February 3, 1995, Webb reported injuring his left hip during the previous week while helping a friend build garage doors. Webb reported that he had experienced similar pain "3 to 6 months ago after getting in and out of small cars." He described his general health as "good" and noted that he continued to take blood pressure medication without side effects. It was further noted that he remained unemployed and spent his days working around the house. Webb reported that he exercised by walking five miles twice a week.

In April 1996, Webb was treated for a blistered right hand, possibly related to weeding, or mechanical work involved in installing brakes on his car. In May 1996, Webb presented with complaints of left knee pain and swelling that had lasted about a week. Webb had fluid in his knee, but an x-ray revealed only "minimal degenerative changes."[4] A medical report from the next month noted that the knee was "quite a bit better."

On July 8, 1996, Webb complained of back pain when he lied down, and reported that he napped daily. Webb's blood pressure was elevated and Dr. Naymik switched him to a new hypertension medication (Norvasc). Physician's notes from July 17, 1996 indicated that Webb was taking his medication without side effects and it "seem[ed] to be lowering his B/P [blood pressure] adequately." On September 26, 1996, Webb reported continuing back pain, and requested more Relafen, a pain medication which "worked for him."

In November 1996, Webb was briefly treated for an episode of intestinal problems. Dr. Naymik assessed him with possible diverticulitis (inflammation of the colon), which was

---

[4]Webb was age 44 at this point.

getting better, or gastroenteritis (inflammation of the stomach or intestines), and prescribed antibiotics.

There is no evidence of medical treatment during 1997. Webb's insured status expired on September 30, 1997. Therefore, the relevant period for his disability status is only that which predates September 30, 1997. *See* 20 C.F.R. §§ 404.981, 422.210.

In 2000, Webb filed an application for disability insurance benefits, alleging disability since 1991 due to back pain, high blood pressure, arm pain, weakness and lack of sleep. After his application was denied initially, and upon reconsideration, Webb applied for a hearing before an ALJ. The ALJ determined that Webb was not disabled because he did not suffer from a severe impairment during the relevant period.

## II.

In assessing the severity of Webb's alleged impairments, the ALJ properly considered the medical evidence and noted, "[T]reating records from his 1991 alleged onset date through his 1997 date last insured are relatively sparse, and depict a pattern of only transitory and intermittent medical conditions rather than any chronic condition which would produce significant work-related restrictions." Substantial evidence supports the ALJ's assessment.[5]

---

[5]The majority attempts to excuse Webb's failure to provide sufficient evidence of a severe disability by asserting that "[t]he ALJ had an affirmative duty to supplement Webb's medical record, to the extent it was incomplete, before rejecting Webb's petition at so early a stage in the analysis." Majority Op. 16786. As the majority recognizes, however, although an ALJ "has an independent duty to fully and fairly develop the record," *Smolen*, 80 F.3d at 1288, this duty is triggered by ambiguous evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence. *Tonapetyan v. Halter*, 242 F.3d 1144, 1150. Neither was the case here. Here, the sporadic nature of Webb's medical records supports the ALJ's determination that Webb's impairments were not severe. During the administrative process, Webb never asserted that his medical records were incomplete and, as the majority recognizes, Webb ultimately bore the burden of establishing disability, and had a duty to provide evidence of such disability. *Bowen*, 482 U.S. at 146.

As noted above, Webb's October 1994 chest x-ray was within normal limits with poor resolution of the thoracic vertebrae. An electro-cardiogram ("E.K.G.") performed at the same time was also normal. In May 1996, Webb sought treatment for fluid in his knee, but an x-ray revealed only "minimal degenerative changes," and a medical report from the next month noted that the knee was "quite a bit better." A lumbar x-ray taken in July 1996 was unremarkable, and Webb's doctor reported that Webb's symptoms were controlled with medication. Physician's notes from July 17, 1996 indicated that Webb was taking his medication without side effects and that the medication seemed to be lowering his blood pressure adequately.[6] On September 26, 1996, Webb

---

[6]The majority states: "During the next several years, Webb continued to suffer from lower back pain and hypertension. He went on and off a variety of medications. Although some had positive results, their side effects were often intolerable. Because of his ailments and the side effects of their treatment, Webb stopped working." Majority Op. 16783. During his testimony before the ALJ, Webb stated that when his blood pressure is lowered to a normal level (by medication) he feels "sluggish," "weak and sleepy." Webb explained that he tried about 20 different medications over the years but when his "pressure would get down to where it belongs — which is basically 120/80 — when I'm at that level, I can't operate and I hurt and ache. I can operate at 140 — 150 over 95 or so. That's where I try to operate at this day. I can handle it. That's too high, but I can at least function. Or my pain pills, they ruin my blood pressure so I try to monitor it accordingly. [Q: Okay. So you feel better when your blood pressure is high] A: Yes."

As explained above, Webb's medical records provide substantial evidence to support the ALJ's determination that the side effects of Webb's medication did not constitute a severe impairment, much less were they intolerable. In summary, On October 27, 1994 Dr. Naymik prescribed Dilacor (hypertension medication) and Relafen (pain medication). On November 7, 1994, Dr. Naymik noted that Webb's blood pressure and upper extremity pain was "much improved" and instructed Webb to continue taking his medication daily. On February 3, 1995, Webb reported that he continued to take his blood pressure medication *without side effects* and described his general health as "good." On July 8, 1996, Dr. Naymik switched Webb to a new hypertension medication (Norvasc), and physician's notes from July 17, 1996 indicate that Webb was taking his medication *without side effects* and it "seem[ed] to be lowering his B/P [blood pressure] adequately."

requested more Relafen, a pain medication which "worked for him." There is no evidence of medical treatment during 1997 and Webb's insured status expired on September 30, 1997.

As the ALJ also noted, Webb's activities during the relevant period, as reported in his medical records, including working with a table saw, doing normal household chores, and walking five miles twice a week, were not consistent with a severe disability. *Id. See* 20 C.F.R. § 404.1521(a) ("An impairment or combination of impairments is not severe if it does not significantly limit [the] physical or mental ability to do basic work activities."); 20 C.F.R. § 404.1521(b) (defining "basic work activities" as the "abilities and aptitudes necessary to do most jobs" including physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling).

Because the ALJ's determination that Webb did not suffer from a severe impairment at step-two of the five-step sequential analysis was supported by substantial evidence I would affirm the ALJ's finding that Webb is not disabled within the meaning of the Social Security Act.