**Leean WICK, Plaintiff—Appellant,**

v.

**Jo Anne B. BARNHART, Commissioner, Social Security Administration, Defendant—Appellee.**

No. 04–35579.

United States Court of Appeals, Ninth Circuit.

Submitted Sept. 15, 2005.*

Filed March 10, 2006.

---

* This panel unanimously finds this case suitable for decision without oral argument. *See* Fed. R.App. P. 34(a)(2).

Kathryn Tassinari, Esq., Robert Baron, Esq., Cram, Harder, Wells & Baron, P.C., Eugene, OR, for Plaintiff—Appellant.

David M. Blume, Esq., Seattle, WA, for Defendant—Appellee.

Before: FISHER, GOULD and BEA, Circuit Judges.

### MEMORANDUM **

Plaintiff–Appellant Wick appeals the district court's decision affirming the Commissioner's denial of her application for disability benefits and supplemental social security income. Wick contends that the ALJ erred in discrediting her subjective symptom and pain testimony, in rejecting the opinions of various mental health physicians and in finding that she retains the residual functional capacity to perform other work. Because the parties are familiar with the facts and procedure of this case, we recite them only as necessary to our decision. We reverse and remand.

### I.

Because the ALJ determined that Wick suffered from physical and mental impairments, the ALJ could reject her testimony only upon finding "affirmative evidence" of malingering or expressing "clear and convincing reasons" for doing so. *Smolen v. Chater*, 80 F.3d 1273, 1283–84 (9th Cir. 1996). The ALJ discredited Wick's subjective symptom testimony on the grounds that Wick could carry on sufficient daily exertional activities and that her pain complaints were unsupported by objective medical evidence. In addition, the ALJ indicated malingering based on what she characterized as Wick's "positive compression test on Waddell tests" in November 2002.

First, the Waddell test does not by itself constitute "affirmative evidence" of malingering. The test establishes five "signs" of nonorganic sources of lower back pain and does not distinguish between malingering and psychological conditions. *See* Gordon Waddell et al., *Nonorganic Physical Signs in Low–Back Pain*, 5 Spine 117, 117–25 (Mar.-Apr.1980). Moreover, Dr. Schroeder did not indicate how many positive Waddell signs Wick demonstrated or whether they were attributable to malingering rather than psychological conditions.[1] Indeed, Dr. Schroeder

---

** This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36–3.

1. Under the Waddell test, only a finding of three or more of the five types of signs is "clinically significant." Waddell et al., *Nonorganic Physical Signs in Low–Back Pain*, 5

himself diagnosed Wick with chronic depression and morbid obesity, in addition to degenerative disk disease, status post bilateral patellectomies, multiple knee reconstructive surgeries and left carpal tunnel syndrome. Similarly, although Dr. Pitchford reported in September 2002 that Wick's personality assessment "indicates a high probability of psychiatric symptom exaggeration," her only conclusion was that the assessment was therefore "not valid to interpret." In any event, Dr. Pitchford diagnosed Wick with "depressive disorder NOS with elements of dysthymia" and "pain disorder associated with both psychological factors *and* a general medical condition" (emphasis added). Consequently, the ALJ's finding that Wick's examinations "indicat[ed] malingering" is not supported by substantial evidence.

■ Second, the ALJ erroneously concluded that Wick's daily activities—including grocery shopping, attending to the basic needs of her son, occasionally cooking, doing some light household chores and caring for her ailing mother, all *with assistance*—involved functions that were inconsistent with her representations of pain, symptoms and limitations.[2] Wick's activities did not consume a "substantial part" of her day, nor did they involve "the performance of physical functions that are transferable to a work setting" with regard to the impact of pain. *See Fair v. Bowen,* 885 F.2d 597, 603 (9th Cir.1989) (explaining that such specific findings *"may be* sufficient to discredit an allegation of disabling excess pain") (emphasis added). As we have stated, "the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability. One does not need to be utterly incapacitated in order to be disabled." *Vertigan v. Halter,* 260 F.3d 1044, 1050 (9th Cir.2001) (internal quotations omitted).[3] Indeed, a patient may engage in such activities *"despite* pain for therapeutic reasons, but that does not mean she could concentrate on work despite the pain or could engage in similar activity for a longer period given the pain involved." *Id.; see also Fair,* 885 F.2d at 603 ( "[M]any home activities are not easily transferable to . . . the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication.").

On the record before us, the ALJ's reasons for rejecting Wick's complaints are not substantial enough to meet the "clear and convincing" standard when balanced against Wick's lengthy medical history (made worse by her obesity) and her constant quest for medical treatment and pain relief.

---

Spine at 118; *see also* 5 Attorneys' Textbook of Medicine P 15 A. 83 (Roscoe N. Gray and Louise J. Gordy eds., 3d ed. 2000) ("While a positive test in one category is not considered conclusive, when three of the five categories are positive, there is a high probability of nonorganic pathology.").

2. The ALJ also noted that Wick "attend[ed] an accounting course at a community college" in 1998 and "worked as a telephone solicitor" for three months in 1999. However, Wick testified that her medical impairments caused her both to stop attending her classes and to quit her job as a solicitor.

3. The ALJ erred, for example, in basing her adverse credibility finding in part on the fact that Wick "went to dinner or a movie with a friend" once a month and that she "played bingo." We have recognized that "disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations." *Reddick v. Chater,* 157 F.3d 715, 722 (9th Cir.1998); *see also Cooper v. Bowen,* 815 F.2d 557, 561 (9th Cir.1987) (noting that a disability claimant need not "vegetate in a dark room" in order to be deemed eligible for benefits).

## II.

An ALJ may find an impairment not severe "only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work." *Webb v. Barnhart,* 433 F.3d 683, 686 (9th Cir.2005). In finding Wick's mental impairment nonsevere, the ALJ relied on an April 30, 2000 report by Wick's treating psychiatrist, Dr. Strgar, that was based on a visit with Wick on January 7, 2000. Dr. Strgar wrote that during this visit, he was "not able to identify any significant psychological or psychiatric impairment which would bear on her employability." But he acknowledged that he had "no further contact with Mrs. Wick" since then and therefore was "unable to comment on her *current* psychiatric or mental health status" (emphasis added).

The IJ's reliance on Dr. Strgar's April 2000 report is problematic, given the evidence of Wick's recurrent depression at least as early as 1998, when examining psychiatrist Dr. Van de Lindt diagnosed her with major depressive disorder, and continuing into 2001.[4] For example, the record reveals that Wick reported depression to Dr. Haugen during a postoperative evaluation on January 26, 2000, just a few weeks after her meeting with Dr. Strgar. Four months later, on May 18, 2000, psychologist Dr. Sjodin diagnosed Wick with major depressive disorder, and in February 2001, examining psychiatrist Dr. McConochie diagnosed Wick with bipolar disorder, including depression. Dr. McConochie reported that Wick has "a severe impairment in her ability to perform with

adequate productivity on a job due to depression and related symptoms," and that she "has a moderate impairment in her ability to perform mistake-free work due to attention, concentration and motivation problems." Indeed, Wick's recurrent depression is confirmed by Dr. Strgar himself, who, on May 7, 2001, after having last seen Wick in January 2000, assessed major depressive disorder and increased Wick's medication. On July 20, 2001, Dr. Strgar further noted that Wick had not significantly benefitted from the medications.[5]

Although the ALJ made note of these opinions, she discredited them in favor of Dr. Strgar's April 2000 report because (1) the ALJ found the opinions to be based on Wick's subjective complaints, (2) Wick's activities lessened the credibility of those opinions and (3) the ALJ viewed the doctors' evaluations as normal, unremarkable or benign.

■ In resolving conflicting evidence in the record, an ALJ may reject the opinions of examining physicians only for specific and legitimate reasons that are supported by substantial evidence in the record. *See Lester v. Chater,* 81 F.3d 821, 830–31 (9th Cir.1995). The ALJ did not meet that standard here. First, the ALJ erred by relying on her flawed determination of Wick's credibility to reject the medical opinion of Dr. Van de Lindt. *See Sousa v. Callahan,* 143 F.3d 1240, 1244–45 (9th Cir. 1998). Second, substantial evidence does not support the ALJ's characterization of the mental status examinations by Drs. Van de Lindt, Sjodin and McConochie as "unremarkable," "normal" or "benign."

4. In 1998, the agency's reviewing psychologists also identified major depressive disorder and moderate symptoms of mental impairment, including limitations in social functioning and an inability to work in coordination with or proximity to others.

5. The ALJ noted that Dr. Strgar eventually reported in October 2001 that Wick's presentation was consistent with being mentally well. [ER 32] Even so, the evidence demonstrates that Wick's depression was both recurrent and more than a "slight abnormality." *See Webb,* 433 F.3d 683, 686.

For example, Dr. Van de Lindt observed Wick to have a "dysphoric mood" and "symptoms suggestive of a major depressive disorder" that was currently "moderate" in intensity.[6] Similarly, Dr. Sjodin diagnosed "major depressive disorder, recurrent, and dependent personality traits" based not only on Wick's poor ability to calculate serial sevens (as the ALJ noted) but also on the fact that Wick was "frequently tearful throughout the examination," restricted in her social functions and limited in "concentration, persistence and pace." Dr. McConochie's examination also revealed that Wick "struggled with symptoms of depression and anxiety," which constituted her "main psychological limitations to work activity." These opinions are further corroborated by Dr. Strgar's 2001 treatment notes. Finally, the ALJ gave no reasons for failing to credit the limitations assessed by the agency's reviewing psychologists.

On this record, the ALJ did not have substantial evidence to find that the medical record clearly established that Wick's mental impairments were nonsevere. *See Webb*, 433 F.3d at 686–87.

### III.

Because of these errors, the ALJ did not consider whether the combined effects of Wick's severe physical *and* mental disorders amounted to a listed impairment under Step 3. *See Lester*, 81 F.3d at 828–29. In addition, the ALJ did not factor Wick's mental impairment limitations in her Step 4 assessment of Wick's residual functioning capacity or in her Step 5 determination of whether the government met the burden of showing that Wick can do other work in the national economy. *See Edlund v. Massanari*, 253 F.3d 1152, 1160

(9th Cir.2001). We therefore **REVERSE** the Commissioner's denial of benefits and **REMAND** for further proceedings in light of Wick's severe mental impairment in addition to her severe physical impairments. On remand, the ALJ must pose a hypothetical to the vocational expert that takes into account Wick's mental impairment as well as the pain, symptoms and limitations to which Wick credibly testified. *See DeLorme v. Sullivan*, 924 F.2d 841, 850 (9th Cir.1991).

### REVERSED and REMANDED.

BEA, Circuit Judge, dissenting.

I respectfully dissent. Because the record contained "affirmative evidence of malingering" and the ALJ made specific findings as to why Wick was not credible, we must defer to the ALJ's decision to discredit Wick's testimony. Because the ALJ permissibly discredited Wick's testimony, and because Wick's treating psychiatrist found no mental impairment that would affect Wick's ability to work, the ALJ did not err in failing to consider Wick's purported psychological and psychiatric limitations at any step in the sequential disability analysis.

### I.

The logical implication of the majority memorandum disposition is that, absent a medical expert's express opinion that a claimant is a malingerer, an ALJ lacks "affirmative evidence of malingering." None of our cases, however, establishes so stringent a rule. Rather, we must uphold an ALJ's findings when they are supported by inferences reasonably drawn from the record. *See Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir.2001) ("Sub-

---

**6.** Dysphoria is an "emotional state of anxiety, depression, and restlessness." THE AMERICAN HERITAGE COLLEGE DICTIONARY 429 (3d ed.2000).

stantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Where the evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld." (internal quotation marks and citations omitted)).

Here, the ALJ knew from Dr. Schroeder's report that Wick had displayed at least one positive Waddell sign. Given that not a single one of Wick's numerous doctors diagnosed Wick with any psychological condition that could cause low-back pain—certainly Wick's claimed depression cannot have had such an effect—there was no reason for the ALJ to consider a positive Waddell sign in Wick's case as anything other than evidence of malingering. Moreover, the ALJ was entitled to treat a single positive Waddell sign as evidence of malingering. Admittedly, were the ALJ an orthopaedist diagnosing the source of Wick's low-back pain, only three or more positive Waddell signs would be "clinically significant." Waddell, *supra*, at 118. Clinical significance, however, is not the touchstone here. The ALJ was not a clinician but an arbiter charged with assessing Wick's credibility by evaluating the record as a whole, observing Wick's demeanor, and exercising judgment. Wick's positive compression test indicated that she had claimed to experience low-back pain from an action that could not possibly have caused such pain.[1] As an arbiter and not a clinician, the ALJ was entitled to interpret

this fact as affirmative evidence of malingering.[2]

Because the record contained affirmative evidence of malingering, the ALJ was required to give only "specific"—not "clear and convincing"—reasons for discrediting Wick's testimony. *See Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir.1991) (en banc). Thus, the ALJ adequately justified discrediting Wick's testimony by providing a detailed review of the abundant objective medical evidence tending to contradict Wick's allegations of pain.

## II.

In social security cases, "[t]he opinions of treating physicians are given greater weight than those of examining but non-treating physicians or physicians who only review the record." *Benton ex rel. Benton v. Barnhart*, 331 F.3d 1030, 1036 (9th Cir. 2003). An ALJ may reject the opinion of a treating physician in favor of the opinions of consulting or examining physicians only for "specific and legitimate" reasons supported by substantial evidence. *Lester*, 81 F.3d at 830.

Here, Wick's treating psychiatrist, Dr. Strgar, opined that Wick had no "significant psychological or psychiatric impairment" bearing on her capacity for work. This opinion is consistent with notes Dr. Strgar made during three different visits with Wick during 1999 and 2000, in which he indicated that Wick was responding well under treatment with Effexor. Drs.

---

1. In a compression or "axial loading" test, the examiner places pressure on the standing patient's skull. If the patient reports low-back pain, the Waddell sign is positive. Waddell, *supra,* at 118.

2. In deciding that the ALJ lacked affirmative evidence of malingering, the majority memorandum disposition places great weight on Dr. Schroeder's various diagnoses of Wick's physical problems. The references to Dr.

Schroeder's report, however, are incomplete. Dr. Schroeder indicated that the problems diagnosed were "unrelated" to the motor vehicle accident that Wick claimed was the basis for her neck and low-back pain. Thus, the diagnoses that the majority memorandum disposition emphasizes in no way undermine the ALJ's interpretation of Dr. Schroeder's report as containing affirmative evidence of malingering.

Van der Lindt, Sjodin, and McConochie were all non-treating physicians who assessed Wick's mental health according to her own statements. Given that the ALJ permissibly discredited Wick and that the opinions of treating physicians are entitled to greater weight than the opinions of non-treating physicians, the ALJ need not have rejected Dr. Strgar's opinion in favor of the arguably conflicting opinions of Drs. Van der Lindt, Sjodin, and McConochie.

For these reasons, I would not require the ALJ to consider the effects of Wick's purported mental disorders at any step of the sequential disability analysis. I would affirm the Commissioner's denial of benefits.