**Craig O'BOSKY, Plaintiff,**

v.

**Michael J. ASTRUE, Commissioner of Social Security, Defendant.**

**No. CIV S–07–1957 DAD.**

United States District Court, E.D. California.

Aug. 24, 2009.

Ann M. Cerney, Attorney at Law, Stockton, CA, for Plaintiff.

Bobbie J. Montoya, United States Attorney's Office, Sacramento, CA, Sarah Lynn Ryan, Social Security Administration Office of the General Counsel, San Francisco, CA, for Defendant.

## ORDER

DALE A. DROZD, United States Magistrate Judge.

This social security action was submitted to the court, without oral argument, for ruling on plaintiff's motion for summary judgment and defendant's cross-motion for summary judgment. For the reasons explained below, plaintiff's motion is granted, the decision of the Commissioner of Social Security (Commissioner) is reversed, and this matter is remanded with the direction to award benefits.

### PROCEDURAL BACKGROUND

On April 19, 2000, plaintiff applied for disability benefits under Title II of the Social Security Act (Act), alleging onset of disability on May 25, 1994.[1] (Transcript (Tr.) at 218–20, 233, 254–58.) The application was denied initially on September 15, 2000, and upon reconsideration on February 8, 2001. (Tr. at 199–208.) Pursuant to plaintiff's timely request, a hearing was held before an administrative law judge (ALJ) on May 1, 2002, at which time plaintiff was represented by counsel and testified. (Tr. at 209, 812–50.) In a decision issued on August 9, 2002, the ALJ determined that plaintiff was not disabled through June 30, 2000, his date last insured. (Tr. at 738–48.) On December 11,

---

1. A previous application filed by plaintiff in February 1996 was denied initially and upon reconsideration in 1996. (Tr. at 41–52, 55–58.) After an administrative hearing, an unfavorable decision was issued on December 12, 1997. (Tr. at 53, 187–91.) The Appeals Council denied plaintiff's request for review in May 1999. (Tr. at 30–34.) Plaintiff did not seek judicial review.

2004, the Appeals Council granted plaintiff's request for review, vacated the ALJ's decision, and remanded the case for further proceedings. (765–76, 777–81.) On remand, a supplemental hearing was held before the same ALJ on December 20, 2005. (Tr. at 851–81.) In a decision dated July 28, 2006, the ALJ again determined that plaintiff was not disabled through his date last insured. (Tr. at 21–29.) The ALJ entered the following findings:

1. The claimant last met the insured status requirements of the Social Security Act on June 30, 2000.

2. The claimant did not engage in substantial gainful activity during the period at issue, December 23, 1997, which is the date after the prior Administrative Law Judge's decision was issued, through his date last insured, June 30, 2000 (20 CFR 404.1520(b) and 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following severe impairment: continued difficulties following a lumbar fusion (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, I find that, during the period at issue, the claimant had the residual functional capacity to lift 10 pounds occasionally. He was capable of moving small objects throughout the workday. He was capable of standing and walking in combination no more than 30 minutes at a time for a total not [to] exceed two hours in a workday. He was capable of sitting for the remainder of the day. He could not climb ladders or scaffolding although he could climb stairs. He could not work at heights, around vibrations or around hazardous, moving machinery. Any mild mental limitations would not serve to further decrease the claimant's residual functional capacity, even when considered in combination with his back impairment.

6. Through the date last insured, the claimant was unable to perform past relevant work (20 CFR 404.1565).

7. The claimant was born on April 16, 1967, and was 32 years old on the date last insured, which is defined as a "younger individual age 18–44" (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical–Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82–41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1560(c) and 404.1566).

11. The claimant was not under a "disability," as defined in the Social Security Act, at any time from De-

cember 23, 1997 through June 30, 2000, the date last insured (20 CFR 404.1520(g)).

(Tr. at 23–28.)

On August 7, 2006, plaintiff requested review of the ALJ's decision. (Tr. at 17, 704–34.) The Appeals Council denied the request on August 3, 2007. (Tr. at 10–14.) Plaintiff sought judicial review pursuant to 42 U.S.C. § 405(g) by filing the complaint in this action on September 19, 2007.

## LEGAL STANDARD

■■■ The Commissioner's decision that a claimant is not disabled will be upheld if the findings of fact are supported by substantial evidence and the proper legal standards were applied. *Schneider v. Comm'r of the Soc. Sec. Admin.*, 223 F.3d 968, 973 (9th Cir.2000); *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir.1999). The findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive. *See Miller v. Heckler*, 770 F.2d 845, 847 (9th Cir.1985). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Morgan*, 169 F.3d at 599; *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir.1985) (citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)).

■■■ A reviewing court must consider the record as a whole, weighing both the evidence that supports and the evidence that detracts from the ALJ's conclusion. *See Jones*, 760 F.2d at 995. The court may not affirm the ALJ's decision simply by isolating a specific quantum of supporting evidence. *Id.*; *see also Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir.1989). If substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a finding of either disability or nondisability, the finding of the ALJ is conclusive, *see Sprague v. Bow-*

*en*, 812 F.2d 1226, 1229–30 (9th Cir.1987), and may be set aside only if an improper legal standard was applied in weighing the evidence, *see Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir.1988).

■■■ In determining whether or not a claimant is disabled, the ALJ should apply the five-step sequential evaluation process established under the Social Security regulations. Title 20 of the Code of Federal Regulations, Section 404.1520, sets forth the test used to assess disability. *See Bowen v. Yuckert*, 482 U.S. 137, 140–42, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). The five-step process has been summarized as follows:

> Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.
>
> Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.
>
> Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1? If so, the claimant is conclusively presumed disabled. If not, proceed to step four.
>
> Step four: Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.
>
> Step five: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir.1995).

■■■ The claimant bears the burden of proof in the first four steps of the sequential evaluation process. *Yuckert*, 482 U.S. at 146 n. 5, 107 S.Ct. 2287. The Commis-

sioner bears the burden if the sequential evaluation process proceeds to step five. *Id.*; *Tackett v. Apfel,* 180 F.3d 1094, 1098 (9th Cir.1999).

## APPLICATION

Plaintiff advances the following arguments in support of his motion for summary judgment: (1) the ALJ's finding that plaintiff's depression was not a severe impairment is not based on substantial evidence; (2) the ALJ committed reversible error in failing to provide "clear and convincing" reasons for rejecting the opinion of Dr. Yee, plaintiff's long-term treating physician; (3) the ALJ's credibility findings are not supported by substantial evidence; and (4) the Commissioner failed to sustain his burden of establishing that there is other work in the national economy that plaintiff could perform. These arguments are addressed below.

### I. *Determination of Severe Impairments*

■ Plaintiff's first argument challenges the ALJ's decision at step two of the sequential evaluation process. At this step, the ALJ must determine if the claimant has a medically severe impairment or combination of impairments. *Smolen v. Chater,* 80 F.3d 1273, 1289–90 (9th Cir.1996) (citing *Yuckert,* 482 U.S. at 140–41, 107 S.Ct. 2287).

■ The Commissioner's regulations provide that "[a]n impairment or combination of impairments is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities."[2] 20 C.F.R. § 416.921(a). The Supreme Court has observed that the se-

verity regulation serves to "identify[ ] at an early stage those claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled even if their age, education, and experience were taken into account." *Yuckert,* 482 U.S. at 153, 107 S.Ct. 2287. "Step two, then, is 'a de minimis screening device [used] to dispose of groundless claims[.]' " *Webb v. Barnhart,* 433 F.3d 683, 687 (9th Cir.2005) (quoting *Smolen,* 80 F.3d at 1290). *See also Edlund v. Massanari,* 253 F.3d 1152, 1158–59 (9th Cir. 2001). "An impairment or combination of impairments may be found 'not severe *only if* the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work.' " *Webb,* 433 F.3d at 686 (quoting *Smolen,* 80 F.3d at 1290, and adding emphasis).

Here, the ALJ found that during the relevant time, i.e., from December 23, 1997 through June 30, 2000, plaintiff had only one severe impairment: continued difficulties following lumbar fusion. (Tr. at 24.) However, the ALJ's step-two analysis is devoted entirely to plaintiff's depression, which the ALJ found to be "not 'severe,' as defined by the Act." (Tr. at 24–25.) In support of this finding, the ALJ cited "minimal mention of a mental impairment in the treatment records during the period at issue" and a Psychiatric Review Technique form dated January 24, 2001, in which a state agency psychiatrist opined that there was insufficient evidence to establish the existence of any mental impairment from the alleged onset date of disability through the date last insured. (Tr. at 24, citing Ex. B9F [tr. at 378–80].) The

---

**2.** Basic work activities encompass "the abilities and aptitudes necessary to do most jobs," including (1) physical functions such as walking, standing, sitting, lifting and carrying, (2) capacities such as seeing, hearing, and speaking, (3) understanding, carrying out, and re-

membering simple instructions, (4) use of judgment, (5) responding appropriately to supervision, co-workers, and usual work situations, and (6) dealing with changes in a routine work setting. 20 C.F.R. § 416.921(b).

ALJ also gave "great weight" to the assessment of Michael D. Goldfield, M.D. (Tr. at 24, citing Ex. B 14F [tr. at 414–76].) Dr. Goldfield, a psychiatrist who served as Qualified or Agreed Medical Evaluator in plaintiff's workers compensation proceedings, evaluated plaintiff on June 12, 2000, prior to plaintiff's date last insured, and served his report on July 26, 2000. (Tr. at 420.) Dr. Goldfield supplemented his report on October 27, 2000 and again on December 18, 2000, as additional medical records were supplied to him, but he did not change his opinion. (Tr. at 417–19, 415–16.) According to the ALJ, Dr. Goldfield "concluded that the claimant suffers from a dysthymic disorder that causes no more than a slight disability in any of the work function areas, including maintaining an appropriate work pace, performing complex tasks, relating to others and making appropriate decisions." (Tr. at 24.) The ALJ gave "great weight to this assessment" on the grounds that it was based on an actual examination of plaintiff and was consistent with plaintiff's treatment records during the period at issue. (*Id.*)

The ALJ considered but rejected the opinions of two psychiatrists who examined plaintiff after his date last insured. Alberto G. Lopez, M.D., examined plaintiff in April 2002 and prepared both a written evaluation (tr. at 24, citing Ex. 9B/10 [3]) and a form Medical Source Statement Concerning the Nature and Severity of an Individual's Mental Impairment (tr. at 24, citing Ex. B15F [4]). The ALJ discounted Dr. Lopez's opinions on the following grounds: the doctor's opinion was rendered almost two years after plaintiff's date last insured; the doctor found only mild to no significant limitations; the doctor opined that plaintiff's condition had not

deteriorated since 1997 and an ALJ previously found plaintiff "not disabled" in December 1997; the doctor examined plaintiff on only one occasion; the doctor noted that plaintiff had never sought psychological or psychiatric care, was "somewhat ambivalent" about receiving mental health treatment, and did not appear to have taken any psychotropic medications; although the doctor concluded that plaintiff exhibited signs of depression, the ALJ believed that "many of the signs listed are also signs of pain"; the doctor concluded that plaintiff's mental impairment would preclude him from working full-time but suggested that plaintiff's treatment should focus on pain management skills; the ALJ found it plausible that plaintiff "would have limitations because of pain" but did not believe that Dr. Lopez's opinions supported a finding that plaintiff had a severe mental impairment before June 30, 2000. The ALJ concluded his discussion of Dr. Lopez's opinions by emphasizing that plaintiff "has not seen the need to seek mental health treatment" and by asserting that "any symptoms noted by Dr. Lopez are inadequately tied to a mental condition." (Tr. at 24.)

The ALJ gave even less weight to the opinion of Dr. Kalman. (Tr. at 24–25.) Lee P. Kalman, M.D., Psy.D., M.F.C.C., examined plaintiff on November 29, 2005, and prepared both a psychiatric evaluation report and a form Medical Source Statement Concerning the Nature and Severity of an Individual's Mental Impairment. (Tr. at 537–45.) The ALJ discounted Dr. Kalman's opinions on the following grounds: the doctor examined plaintiff several years after his date last insured; the doctor opined that plaintiff had been mentally impaired to the same degree for

---

3. Dr. Lopez's report appears in the record as Exhibit B9B. (Tr. at 755–64.)

4. Dr. Lopez's medical source statement appears in the record as Exhibit B 16F. (*See* tr. at 486–89.)

over ten years despite the evidence of record showing lack of treatment and lack of medication for any mental impairment during that ten-year period; and it was not evident that the doctor had questioned plaintiff about his condition before his date last insured. (Tr. at 24–25.) The ALJ also did not believe that Dr. Kalman's mental status examination and assessment of functioning "truly addresse[d]" plaintiff's condition prior to his date last insured, and he found the opinion "not consistent with the claimant's treatment records and other weighty evidence of record that are [sic] contemporaneous to the period at issue." (Tr. at 25.)

■ The ALJ concluded that plaintiff's mental impairment "only caused him to experience mild restrictions of his activities of daily living and mild difficulties maintaining social functioning" while retaining "the understanding and memory, sustained concentration and persistence, social interaction and adaptation skills necessary to engage in substantial gainful activity." (Tr. at 25.)

The court finds that the ALJ did not properly apply the law and reached a conclusion contrary to substantial evidence in the record in this regard. Treatment records and the examining psychiatrists' reports—Dr. Goldfield's on June 12, 2000, eighteen days prior to plaintiff's last date insured, and Dr. Lopez's on May 8, 2002, slightly less than two years after plaintiff's last date insured—demonstrate that plaintiff's depression was more than a slight abnormality as of June 30, 2000, and that this mental impairment had more than a minimal effect on plaintiff's ability to work at the relevant time.

First, the ALJ's finding that there was "minimal mention of a mental impairment in the treatment records" at the relevant time is contradicted by the medical records before the court. Gary A. Schneiderman, M.D., a spine surgeon who saw plaintiff on July 13, 1998, reported that plaintiff's psychiatric symptoms were positive for depression. (Tr. at 178.) The doctor observed that plaintiff had suffered multiple industrial injuries to his lumbar spine between 1990 and 1994, had been treated for those injuries for eight years, had "failed all nonoperative modalities of treatment," had been extensively evaluated, was unable to work, and had experienced a substantially altered lifestyle. (Tr. at 177, 180.) Dr. Schneiderman advised plaintiff that it was possible to consider him for a lumbar fusion if a psychological profile showed that he could be considered a surgical candidate. (Tr. at 180–81.) On September 1, 1998, Dr. Schneiderman recommended against surgery after he reviewed the psychological profile of plaintiff prepared by Dr. Martin Shaffer on August 21, 1998. (Tr. at 283–84.) Dr. Goldfield also had an opportunity to review a report from Dr. Shaffer and noted in his October 27, 2000 supplemental report that the MMPI portion of Dr. Shaffer's report "showed [plaintiff] to have chronic pain and some associated depression." (Tr. at 417.)

Evidence of plaintiff's mental impairment during the relevant time is also found in the treatment records of Randall K. Yee, M.D., plaintiff's treating physician. On April 13, 2000, Dr. Yee prescribed the psychotropic drug Effexor at 37.5 milligrams per day for plaintiff's "associated depression" and to help his chronic pain. (Tr. at 328.) On April 18, 2000, Dr. Yee continued the Effexor at the doubled dosage of 75 milligrams per day. (Tr. at 326.) On June 5, 2000, Dr. Yee's diagnosis was chronic back pain, failed back, underlying degenerative joint disease with osteophyte formation, and depression secondary to the physical impairments. (Tr. at 318.) Dr. Yee noted that plaintiff was tolerating Effexor along with the medications prescribed for pain and sleep. (*Id.*) When Dr. Yee saw plaintiff on July 12, 2000, just twelve days after plaintiff's

date last insured, plaintiff reported that his pain intensity had increased despite all the medications he had tried, and Dr. Yee described him as "very distraught and despondent about not getting relief of his back pain." (Tr. at 312.) On September 8, 2000, Dr. Yee noted that plaintiff felt "somewhat 'down'" but had no suicidal ideation. (Tr. at 311.) Even the neurologist who performed an orthopedic examination of plaintiff on August 7, 2000, less than five weeks after plaintiff's last date insured, observed that plaintiff was "a somewhat depressed appearing gentleman." (Tr. at 298.) These records demonstrate that plaintiff's treatment records contained more than "minimal mention of a mental impairment" during the period of time at issue.[5] The conclusory form opinion of the state agency psychiatrist who found insufficient evidence to establish the existence of any mental impairment in January 2001 contains no indication that the records described above were considered.

Second, a review of Dr. Goldfield's psychiatric evaluation reveals that the ALJ erred in relying on it as evidence supporting a finding that plaintiff's depression was not a severe impairment at the relevant time. Dr. Goldfield spent two hours examining plaintiff on June 12, 2000, two additional hours performing psychological testing and reviewing the results, and almost three hours reviewing voluminous medical records dating back to 1990. (Tr. at 421.) Dr. Goldfield described plaintiff as downcast, subdued, and depressed. (Tr. at 426.) Plaintiff admitted to depression, difficulty sleeping, tiredness, easy fatigability, difficulty concentrating, feelings of low self-esteem, a loss of confidence in himself,

weight gain, the giving up of previously pleasurable activities, and irritability. (*Id.*) In his review of the medical records, Dr. Goldfield noted the following: in April 2000 Dr. Yee placed plaintiff on Effexor; in July 1998 Dr. Schneiderman found a psychological evaluation essential before considering plaintiff for surgery; in August 1998 Dr. Shaffer determined the outcome potential of surgery to be marginal based on psychometric indices; the salient features of Dr. Goldfield's own June 12, 2000 MMPI–2 report were "physical complaints and depressed mood." (Tr. at 426–31.) Dr. Goldfield's MMPI–2 report also reflected plaintiff's nervousness, irritability, reaction to minor problems with physical symptoms, tendency to develop physical problems when under stress, difficulty managing routine affairs, indications of poor memory and concentration problems, and inability to make decisions. (Tr. at 431.) At Axis I, Dr. Goldfield diagnosed dysthymic disorder (chronic depression) and psychological factors affecting medical condition with increasing back pain when under stress. (*Id.*) At Axis IV, Dr. Goldfield diagnosed occupational injury and inability to return to his previous occupation, causing depression and stress-aggravated back pain. (Tr. at 432.)

Dr. Goldfield's concluding summary and impression included the following remarks: plaintiff "is currently suffering from classical signs and symptoms of a Dysthymic Disorder and from Psychological Factors Affecting His Medical Condition"; plaintiff's emotional disorders are caused entirely by the physical injury suffered in 1994; as a result of the injury, "he is depressed with difficulty sleeping, tiredness, easy fatigability, difficulty concen-

---

**5.** The Ninth Circuit has held that medical evidence from a physician who is not a mental health specialist "constitutes 'competent psychiatric evidence' and may not be discredited on the ground that he is not a board certified psychiatrist." *Lester,* 81 F.3d at 833. "Indeed, the treating physician's opinion as to the combined impact of the claimant's limitations-both physical and mental-is entitled to special weight." *Id.*

trating, feelings of low self-esteem, a loss of confidence in himself, weight gain, and the giving up of previously pleasurable activities"; he is irritable and has a lowered frustration tolerance as a result of the injury and the chronic pain and depression from that injury; he was placed on Effexor 75 milligrams a day by his treating physician. (Tr. at 432–33.) Noting that plaintiff was "not interested in any psychotherapy," Dr. Goldfield indicated that he would not force the issue but would strongly recommend that antidepressant medications be continued because "[he] is in definite need of continued psychoactive medications, which could be prescribed by his primary care physician, Dr. Yee." (Tr. at 433.)

With respect to work functions, Dr. Goldfield found no disability in plaintiff's ability to comprehend and follow instructions, perform simple and repetitive tasks, influence people, and accept and carry out responsibility for direction, control, and planning. (Tr. at 433–34.) He found that plaintiff had a slight disability in the ability to maintain a work pace appropriate to a given workload as well as a reduced ability to perform at a consistent pace because of his depression and other factors, which precluded him "from handling a stressful job in the open labor market, as stress aggravates his back pain." (Tr. at 433.) Dr. Goldfield found a slight disability in plaintiff's ability to perform complex and varied tasks, explaining that plaintiff's "pain and depression are causing a reduced ability to synthesize, coordinate and analyze data." (Id.) Dr. Goldfield found a slight disability in plaintiff's ability to relate to other people beyond giving and receiving instructions, again citing plaintiff's depression as a factor in the disability and elaborating that plaintiff has a reduced ability to perform work activities requiring negotiating with explaining or persuading. (Tr. at 434.) Dr. Goldfield found a slight disability in plaintiff's ability to make generalizations, evaluations, or decisions without immediate supervision, as well as a reduced ability to set realistic goals or make plans independently of others. (Id.)

While Dr. Goldstein did not find more than a slight disability in any one work function, it is significant that he found a slight disability in numerous functions, and he specifically found that plaintiff could not handle a stressful job in the open labor market. Plaintiff's claim of a mental impairment is hardly groundless when the impairment has more than a minimal effect on his ability to deal with stress, maintain an appropriate work pace, perform at a consistent pace, perform complex and varied tasks, relate to people, make decisions without immediate supervision, and set realistic goals or make plans independently of others.

Third, a review of Dr. Lopez's opinion reveals that the ALJ improperly rejected the opinion, which also supports a conclusion that plaintiff's mental impairment should be deemed severe for purposes of step-two analysis. While Dr. Lopez examined plaintiff almost two years after plaintiff's date last insured, his psychiatric report is not based merely on plaintiff's condition in April of 2002. Dr. Lopez had been provided with "the voluminous medical file," and he reviewed those records "in their entirety." (Tr. at 755.) He concluded that plaintiff had been significantly depressed since approximately 1995 and that the depression had proved to be chronic. (Tr. at 762.) He determined that plaintiff "does have a chronic depressive disorder, best characterized as a dysthymic disorder," that plaintiff has "a clinically depressed, irritable mood, with multiple neurovegetative signs of depression," and that plaintiff's dysthymic disorder flowed from his work injuries and the development of chronic pain that followed. (Id.)

With respect to plaintiff's ability to work, Dr. Lopez opined that

> [i]n all likelihood, there has been a level of psychiatric disability from 1995, up until the time of this examination. It does not appear that this has been severe enough at any point in time to warrant a total preclusion from returning to the open labor market. However, there has been a level of partial psychiatric disability.

(Tr. at 763.) He determined that plaintiff was "incapable of withstanding the pressures of an eight-hour a day/five-day a week work, because of problems with sleep and low energy." (*Id.*) Dr. Lopez identified the following work function impairments: (1) plaintiff's ability to comprehend and follow instructions is somewhat impaired because of poor memory and concentration, as well as irritability; (2) plaintiff's ability to relate to others in a workplace—coworkers, supervisors, and the public—is impaired because of continuing depression, irritability, and admitted moodiness; (3) plaintiff's ability to maintain a work pace appropriate to a given work load and his ability to perform more complex and varied task are both impaired because of problems with severe low energy, fatigue, and exhaustion. (*Id.*)

The agency form completed by Dr. Lopez on April 24, 2002 provides additional detail about the severity of plaintiff's mental impairment. The form defines "mildly limited" as meaning "[p]erformance of the designated work-related mental function is somewhat impaired," such that the individual can perform the function at a level no greater than 80 to 85% of normal in terms of speed and accuracy and can perform that function only occasionally to frequently, i.e., for 1/3 to 2/3 of an 8–hour workday. (Tr. at 486.) "Moderately limited" is defined as meaning "[p]erformance of the designated work-related mental function is not totally precluded, but it is substantially impaired in terms of speed and accuracy and can be performed only seldom to occasionally during an 8–hour workday," which might mean, for example, for durations lasting from 5 to 15 minutes and not totaling more than 2 to 3 hours in an 8–hour workday. (*Id.*) In the category of understanding and memory, Dr. Lopez found plaintiff mildly limited in one of three work-related mental functions.[6] (Tr. at 486–87.) In the category of sustained concentration and persistence, Dr. Lopez found plaintiff moderately limited in three of the eight work-related mental functions and mildly limited in the other five.[7] (Tr. at 487.) In the category of social interaction, Dr. Lopez found plaintiff moderately limited in two of the five work-related mental functions and mildly limited in two of the remaining three.[8] (Tr. at 487–88.) In the category of adaptation, Dr. Lopez found plaintiff mildly limited in three of four work-related mental functions.[9] (Tr.

---

**6.** Dr. Lopez found plaintiff mildly limited in his ability to understand and remember detailed instructions or tasks.

**7.** Dr. Lopez found that plaintiff was moderately limited in his ability to perform activities within a schedule, maintain regular attendance, and be punctual; to sustain an ordinary routine without special supervision; and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. at 487.)

**8.** Dr. Lopez found plaintiff moderately limited in his ability to interact appropriately with the general public or customers and in his ability to get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes. (Tr. at 487–88.)

**9.** Dr. Lopez found plaintiff mildly limited in his ability to respond appropriately to expected or unexpected changes in the work setting, to be aware of normal hazards and take appropriate precautions, and to set realistic goals or to make plans independently of others.

at 488.) Dr. Lopez opined that work stressors of all kinds would increase plaintiff's level of impairment in all work-related mental functions. (*Id.*) He estimated that plaintiff's mental impairment was sufficiently severe that it would render him unable to complete a workday, if employed full-time, approximately twice per month. (Tr. at 489.) Finally, it was Dr. Lopez's opinion that plaintiff's limitations had lasted for 12 continuous months and that, on the basis of evaluation, treatment, and records, the onset of plaintiff's limitations—at the severity described in the form—commenced in 1995. (*Id.*)

■■■ The court finds that the medical evidence does not clearly establish that plaintiff's mental impairment was a slight abnormality having no more than a minimal effect on his ability to work. Consequently, the ALJ should have identified plaintiff's depression as a severe impairment at step two of the sequential evaluation process. As a result of the ALJ's failure to identify depression as a severe impairment at step two, the ALJ's decision is not supported by substantial evidence in the record as a whole. *See Schneider,* 223 F.3d at 973; *Morgan,* 169 F.3d at 599. In reaching this conclusion, the undersigned is mindful that the step-two inquiry is "a *de minimis* screening device to dispose of groundless claims." *Smolen,* 80 F.3d at 1290. Regardless of whether the evidence related to a severe impairment establishes disability at step three, or ultimately leads to a finding of disability in combination with the claimant's other impairments, it was error not to recognize an impairment as severe when the medical evidence does not clearly establish that the impairment had no more than a minimal effect on the claimant's ability to work at the relevant time. Accordingly, plaintiff is entitled to summary judgment on his challenge to the ALJ's finding that plaintiff's depression was not a severe impairment.

■■■ As a general rule, when a step-two error is found, remand is required so that the ALJ can proceed beyond step two of the evaluation process with respect to all severe impairments and properly consider the previously omitted impairments in combination with all of claimant's impairments, whether severe or not. *See Webb,* 433 F.3d at 688 (remanding for further proceedings where "[t]he ALJ should have continued the sequential analysis beyond step two because there was not substantial evidence to show that Webb's claim was 'groundless' "); *see also* SSR 85–28, 1985 WL 56856, at \*3. However, the court will turn to plaintiff's additional arguments in order to determine whether it is necessary to remand this case for further administrative proceedings.

## II. *Rejection of Treating Physician's Opinions*

Plaintiff argues that the ALJ committed reversible error in failing to provide "clear and convincing" reasons for rejecting the opinion of Dr. Yee, plaintiff's treating physician.

■■■ It is well established that the weight to be given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals. *Lester,* 81 F.3d at 830. "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." *Id.* This is so because a treating doctor is employed to cure and has a greater opportunity to know and observe the patient as an individual. *Id.; Smolen,* 80 F.3d at 1285; *Bates v. Sullivan,* 894 F.2d 1059, 1063 (9th Cir.1990). However, the ALJ need not give weight to conclusory opinions supported by minimal clinical findings. *Meanel v. Apfel,* 172 F.3d 1111, 1113–14

(9th Cir.1999); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir.1989).

 "At least where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for 'clear and convincing' reasons." *Lester*, 81 F.3d at 830 (quoting *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir.1991)). "Even if the treating doctor's opinion is contradicted by another doctor, the Commissioner may not reject this opinion without providing 'specific and legitimate reasons' supported by substantial evidence in the record for so doing." *Lester*, 81 F.3d at 830 (quoting *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir.1983)). If a treating professional's opinion is contradicted by an examining professional's opinion that is supported by different, independent clinical findings, the ALJ may resolve the conflict. *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir.1995) (citing *Magallanes*, 881 F.2d at 751). The opinion of a non-examining professional, without other evidence, is an insufficient basis for rejecting the opinion of either a treating or examining professional. *Lester*, 81 F.3d at 831.

Here, the medical records reflect that Randall K. Yee, M.D., was plaintiff's treating physician from February 1999 to July 2002. (*See* tr. at 304–39, 366–67, 389, 393–412, 451–58, 463–76, 491–508, 547–52.) It appears that from May 1994 through 1998, plaintiff was treated by Rafaelito S. Victoria, M.D., a physician in the same medical group as Dr. Yee.[10] (*See* tr. at 95–106, 340–65, 368–69, 459–62.) Although both Dr.

Victoria and Dr. Yee treated plaintiff during the relevant period from December 23, 1997 through June 30, 2000, the ALJ did not mention Dr. Victoria by name and made only cursory references to Dr. Victoria's treatment records. (*See* tr. at 26.) The ALJ considered but rejected the opinions of Dr. Yee, stating that Dr. Yee

wrote that the claimant had failed conservative treatment, and he offered acupuncture for what he now categorized as "extensive" degenerative joint disease and "chronic pain syndrome [with a] total disability" (Exhibit B–7F/35 [tr. at 337] ). Although Dr. Yee also gave the claimant very specific and very severe limitations,[11] he noted that these limitations would apply for approximately the next six months (Exhibit B–7F/33 [tr. at 335] ). Less than 12 months later, Dr. Yee wrote that he again thought the claimant was "totally disabled," but he gave limitations that were consistent with sedentary work (Exhibit 7 B–7F/28, 20–26 [tr. at 330, 322–28] ). Dr. Yee later told the claimant to avoid sitting for longer than 20 minutes at a time [12] (Exhibit B7F/12–19 [tr. at 314–21] ). I reject Dr. Yee's opinions for the following reasons: they are based on properly discounted subjective complaints; there are inconsistencies between the opinions and clinical and laboratory findings; the physician is advocating on the claimant's behalf; there are inconsistencies between the opinions and the treatment records; the physician's opinions have

---

**10.** Dr. Yee saw plaintiff at least once prior to 1999 in Dr. Victoria's absence. (Tr. at 346) (medical record by Dr. Yee dated July 3, 1996, indicating that "[t]his is Dr. Victoria's patient.").

**11.** The limitations indicated by Dr. Yee were as follows: "No lifting over 5 lbs. No prolonged walking, standing, bending, stooping, kneeling, squatting, climbing stairs or ladders, pushing, or pulling." (Tr. at 335.)

**12.** The limitations listed by Dr. Yee on May 12, 2000, six weeks before plaintiff's date last insured, were as follows: avoid sitting for longer than 20 minutes at a time and no prolonged walking/standing, no repetitive bending/stooping, no kneeling or squatting, no climbing of stairs or ladders, no pushing or pulling, no lifting over 10 pounds. (Tr. at 321.) The same limitations had been identified on May 8, 2000. (Tr. at 324.)

changed without evidence of a change in objective clinical findings; the opinions are unsupported, brief and/or conclusory; and the opinions are inconsistent with one previously expressed in the clinical findings.

(Tr. at 27.)

■ The court finds that the ALJ's cursory discussion of Dr. Yee's opinions misses the mark. First, the ALJ's assertion concerning "properly discounted subjective complaints" would appear to be based on the ALJ's failure to recognize plaintiff's depression as a severe impairment, as set forth *supra*, and on the ALJ's failure to properly evaluate plaintiff's subjective complaints, as set forth *infra*. The alleged discrepancies, inconsistencies, and changes of opinion are presented as mere generalities, have not been demonstrated on the record, and appear to be based on the ALJ's failure to take into consideration plaintiff's severe mental impairment and symptoms of pain. The ALJ's charge of advocacy on plaintiff's behalf fails because the purpose for which a report is obtained, by itself, does not provide a legitimate basis for rejecting it and the ALJ did not note any evidence of an impropriety on the part of Dr. Yee. *See Lester*, 81 F.3d at 832 ("The Secretary may not assume that doctors routinely lie in order to help their patients collect disability benefits. While the Secretary may introduce evidence of actual improprieties, no such evidence exists here."); *Saelee v. Chater*, 94 F.3d 520, 523 (9th Cir.1996); *Reddick v. Chater*, 157 F.3d 715, 726–27 (9th Cir.1998).

■ Notably, the ALJ's list of reasons for rejecting Dr. Yee's opinions does not include an assertion that Dr. Yee's opinions were contradicted by the opinion of any treating or examining physician. The court is unpersuaded by defendant's argument that Dr. Yee's opinions were controverted by the opinion of Dr. Mikol, the neurologist who performed a complete or-

thopedic evaluation of plaintiff on August 7, 2000. First, the court may not affirm a decision to deny benefits on a ground not invoked in making the decision to deny benefits. *Pinto v. Massanari*, 249 F.3d 840, 847 (9th Cir.2001); *see also Stout v. Comm'r of Soc. Sec. Admin.*, 454 F.3d 1050, 1054–56 (9th Cir.2006). Second, Dr. Mikol's opinion considered only plaintiff's physical residual functional capacity and did not consider the impact of any mental impairment or subjective symptoms. The court also notes that Dr. Mikol's opinion contained anomalies, including his express observation that plaintiff was "in obvious discomfort during much of the examination" and sat "on the edge of the examination table uncomfortably," which the doctor contradicted by stating in his diagnosis that "[d]uring the examination he is in no discomfort." (Tr. at 298–99.)

The court finds that the ALJ failed to offer clear and convincing reasons for rejecting Dr. Yee's uncontradicted opinion. Plaintiff is entitled to summary judgment on his claim that the ALJ erred by failing to provide such reasons for rejecting Dr. Yee's opinions.

### III. *Credibility Findings*

■ Once a claimant has presented medical evidence of an underlying impairment, the ALJ may not discredit the claimant's testimony regarding subjective pain and other symptoms merely because the symptoms, as opposed to the impairments, are unsupported by objective medical evidence. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035–36 (9th Cir.2007); *Reddick*, 157 F.3d at 722; *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir.1997). " [T]he ALJ can reject the claimant's testimony about the severity of [his or] her symptoms only by offering specific, clear and convincing reasons for doing so.' " *Lingenfelter*, 504 F.3d at 1036 (quoting

Smolen, 80 F.3d at 1281). *See also Morgan*, 169 F.3d at 599 ("Without affirmative evidence showing that the claimant is malingering, the Commissioner's reasons for rejecting the claimant's testimony must be clear and convincing.").[13]

■■■■■■ The testimony of lay witnesses, including family members, about their own observations regarding the claimant's impairments must be considered and discussed by the ALJ. *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir.2006); *Smolen*, 80 F.3d at 1288; *Sprague*, 812 F.2d at 1232. Clearly, family members who see the claimant on a daily basis are competent to testify as to their observations. *Regennitter v. Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294, 1298 (9th Cir. 1999); *Dodrill v. Shalala*, 12 F.3d 915, 918–19 (9th Cir.1993). If the ALJ chooses to reject or discount the testimony of a lay witness, he must give reasons that are germane to that particular witness. *Regennitter*, 166 F.3d at 1298; *Dodrill*, 12 F.3d at 919.

■■■■■■ The determination of credibility and the resolution of conflicts in the testimony are functions of the ALJ acting on behalf of the Commissioner. *Morgan*, 169 F.3d at 599; *Saelee*, 94 F.3d at 522. In general, an ALJ's assessment of credibility should be given great weight. *Nyman v. Heckler*, 779 F.2d 528, 531 (9th Cir.1985). The ALJ may employ ordinary techniques of credibility evaluation and may take into account prior inconsistent statements or a lack of candor by the witness. *Fair v. Bowen*, 885 F.2d 597, 604 n. 5 (9th Cir.1989). The ALJ may also rely, in part, on his own observations. *See Han v. Bowen*, 882 F.2d 1453, 1458 (9th Cir.1989). However, the ALJ cannot substitute his observations for medical diag-

noses. *Marcia v. Sullivan*, 900 F.2d 172, 177 n. 6 (9th Cir.1990).

In this case, the ALJ addressed credibility issues in his analysis of plaintiff's residual functional capacity. (Tr. at 26.) The ALJ provided a brief summary of plaintiff's written statements and hearing testimony, noted that the reports written by plaintiff's mother were consistent with plaintiff's statements, and found that plaintiff's medically determinable impairments "could have been reasonably expected to produce some of the alleged symptoms, but that [plaintiff's] and his mother's statements concerning the intensity, persistence and limiting effects of these symptoms for the period of issue are not entirely credible." (Tr. at 26.) The ALJ did not identify the symptoms that could have been reasonably expected from the medically determinable impairments or the symptoms that could not have been reasonably expected. Nor did the ALJ specify the statements he found credible as opposed to those he did not find credible.

In apparent support of his finding that the statements of plaintiff and his mother were not entirely credible, the ALJ cited medical evidence, including an MRI dated June 8, 1998, which the ALJ described as showing degenerative disc disease with mild and minimal abnormalities but no significant nerve root impingement, and an MRI dated November 13, 2000, which the ALJ represented as showing "no worsening." (Tr. at 26, citing Ex. B–1F/2 [tr. at 277] & Ex. B14F/41 [tr. at 454].) The ALJ cited medical records which he described as prescribing conservative treatment, imposing minimal restrictions on plaintiff's activities, and recommending against surgery. The ALJ also noted that plaintiff did not undergo surgery until more than

---

**13.** The "clear and convincing" standard "is the most demanding required in Social Secu-

rity cases." *Moore v. Comm'r of the Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir.2002).

two years after his last date insured and asserted that plaintiff was declared able to perform sedentary work less than one year after surgery. The ALJ then determined plaintiff's residual functional capacity by rejecting Dr. Yee's opinions and giving great weight to the opinion of an examining neurologist who performed an orthopedic evaluation of plaintiff in August 2000. (Tr. at 26–27.)

■ The court finds that the ALJ's analysis violates the applicable legal standard by rejecting plaintiff's subjective complaints based on apparent lack of objective medical evidence. The medical records cited by the ALJ in his decision were either not fairly represented or were taken out of context. In any event, the records cited do not demonstrate that plaintiff's subjective complaints are not credible when all impairments and symptoms are considered. The ALJ's citation to plaintiff's statements about daily activities is unavailing, as the limited activities described by plaintiff do not demonstrate plaintiff's ability to work. As has long been recognized, claimants need not be "utterly incapacitated to be eligible for benefits." *Fair*, 885 F.2d at 603. *See also Webb*, 433 F.3d at 688; *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir.2001) ("This court has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability."). In addition, " 'it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation.' " *Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996) (quoting *Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir.1989)).

■ In the complete absence of any evidence of malingering by plaintiff, the ALJ has not given clear and convincing reasons for finding plaintiff's statements "not entirely credible." Although the ALJ found the statements of plaintiff's mother "not entirely credible," he gave no reason germane to the particular witness in making that finding. The ALJ's rejection of plaintiff's testimony is grounded in large part on the erroneous rejection of plaintiff's depression as a severe impairment and his rejection of the treating physician's opinions. The court finds that the ALJ's decision regarding the credibility of plaintiff and his mother is not supported by substantial evidence in the record and that plaintiff is entitled to summary judgment on this claim as well.

## IV. Plaintiff's Ability to Perform Other Work

■ Upon finding a claimant unable to return to his past relevant work, the burden shifts to the Commissioner to prove that the claimant is capable of engaging in other jobs that exist in substantial numbers in the national economy. *Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir. 2001). If the ALJ relies on the testimony of a vocational expert, the ALJ must question the expert in a manner that properly takes into account all limitations on the claimant's ability to engage in work-related functions, including nonexertional limitations. *Moisa v. Barnhart*, 367 F.3d 882, 887 (9th Cir.2004); *Tackett*, 180 F.3d at 1103–04; *Holohan v. Massanari*, 246 F.3d 1195, 1208–09 (9th Cir.2001). "While the ALJ need not include all claimed impairments in his hypotheticals, he must make specific findings explaining his rationale for disbelieving any of the claimant's subjective complaints not included in the hypothetical." *Light*, 119 F.3d at 793.

■ In this case, the ALJ found plaintiff able to engage in other jobs in the national economy on the basis of the vocational expert's response to two hypotheti-

cal questions, the first of which was as follows:

> I'd like for you to consider for me, please, a 38–year–old individual with a high school education and that past work [as a construction foreman and frame carpenter]. Further consider that this individual is capable of lifting 20 pounds occasionally, and 10 pounds frequently. He's capable of standing and walking in combination for at least six hours in a work day, and capable of sitting without limit, were not required to stand or walk [sic]. He can, cannot climb ladders or scaffolding, although he can climb stairs. Should not work at heights, or around vibration, or around hazardous moving machinery. Those are the only limits.

(Tr. at 875.) The vocational expert responded that such an individual could work at light, unskilled jobs such as sewing machine operator, small parts assembler, and inserting machine operator. (*Id.*)

The ALJ's second hypothetical question was as follows:

> Same age, education, and vocational background, now capable of lifting 10 pounds occasionally, and capable of moving small objects throughout the work day. Now capable of standing and walking in combination no more than 30 minutes at a time, total not to exceed two hours in a day, and capable of sitting the remainder of the day without limit. With the same nonexertional restrictions I've given you in hypothetical number one, are there any jobs at that level, too?

(Tr. at 875–76.) The vocational expert responded that an individual described in the ALJ's second hypothetical could work at sedentary jobs such as table worker, ampule sealer, and electronics loader. (Tr. at 876.)

The ALJ's hypothetical questions did not include any mental limitations or any of the limitations found by Dr. Yee on plaintiff's ability to do sedentary work.

Counsel posed modified hypothetical questions to the vocational expert, first adding a limitation to simple, routine, repetitive tasks. The vocational expert testified that the individual could still perform the light work jobs and the sedentary ones because all of the jobs identified were unskilled, simple and routine. (Tr. at 876–77.) Next, counsel added a limitation on plaintiff's ability to complete a normal work day, specifying that plaintiff's speed and accuracy would be limited to 80 to 85 percent of normal for two thirds of an eight-hour work day and to less than 80 percent for the remaining one third of the day. (Tr. at 877–78.) In response to this inquiry, the vocational expert testified that there would be no jobs the individual could perform. (Tr. at 878.) Finally, counsel asked the vocational expert what the workplace tolerance would be for absenteeism for a person in an entry level unskilled job. (Tr. at 879.) The vocational expert testified that it would vary by employer but the average would be one day per month. (*Id.*)

The undersigned finds that the vocational expert's testimony in response to the flawed hypothetical questions posed by the ALJ has no evidentiary value. *See Embrey v. Bowen,* 849 F.2d 418, 422 (9th Cir.1988); *Gallant v. Heckler,* 753 F.2d 1450, 1456 (9th Cir.1984). On the other hand, the modified hypothetical questions posed by plaintiff's counsel are supported by substantial evidence in the record. The limitations on plaintiff's ability to complete a normal work day and maintain an appropriate pace are supported by Dr. Goldfields' opinion in June 2000 that plaintiff was slightly disabled in numerous work functions, including his ability to deal with stress, maintain an appropriate work pace, and perform at a consistent pace. Such limitations, as well as the likelihood of absenteeism, are also supported by Dr. Lopez's opinions in April 2002 that there

had likely been a level of partial psychiatric disability from 1995 onward, that plaintiff was incapable of withstanding the pressures of an eight-hour a day/five-day a week work week due to numerous work function impairments, including impaired ability to maintain a work pace appropriate to a given work load, and inability to complete a full workday approximately twice per month. The vocational expert's testimony provided in response to counsel's modified hypothetical questions demonstrates that, when the effects of plaintiff's severe mental impairment are considered, there are no jobs in the national economy that plaintiff can perform.

## CONCLUSION

 The decision whether to remand a case for additional evidence or to simply award benefits is within the discretion of the court. *Ghokassian v. Shalala,* 41 F.3d 1300, 1304 (9th Cir.1994); *Pitzer v. Sullivan,* 908 F.2d 502, 506 (9th Cir.1990). The Ninth Circuit has stated that, "[g]enerally, we direct the award of benefits in cases where no useful purpose would be served by further administrative proceedings, or where the record has been thoroughly developed." *Ghokassian,* 41 F.3d at 1304 (citing *Varney v. Sec'y of Health & Human Servs.,* 859 F.2d 1396, 1399 (9th Cir. 1988)). This rule recognizes the importance of expediting disability claims. *Holohan,* 246 F.3d at 1210; *Ghokassian,* 41 F.3d at 1304; *Varney,* 859 F.2d at 1401.

 Here, the record has been adequately developed to allow the court to find plaintiff disabled by determining that his depression is a severe impairment, by crediting Dr. Yee's opinions, and by crediting the testimony and reports of plaintiff and his mother. No useful purpose would be served by further administrative proceedings, and the disability application at issue was filed more than nine years ago. In addition, the Appeals Council's remand order already provided an opportunity for further development of the record. The vocational expert's testimony affirmatively in responses to the properly modified hypothetical questions establishes that plaintiff was unable to perform a significant number of jobs in the national economy prior to his date last insured.

For all of these reasons, this matter will be remanded with the direction to award benefits on the ground that plaintiff was under a disability as defined by the Social Security Act prior to June 30, 2000, plaintiff's last date insured. *See Moore,* 278 F.3d at 925 (remanding for payment of benefits where the ALJ improperly rejected the testimony of the plaintiff's examining physicians); *Ghokassian,* 41 F.3d at 1304 (awarding benefits where the ALJ "improperly discounted the opinion of the treating physician").

Accordingly, IT IS HEREBY ORDERED that:

1. Plaintiff's motion for summary judgment (Doc. No. 20) is granted;

2. Defendant's cross-motion for summary judgment (Doc. No. 21) is denied;

3. The decision of the Commissioner of Social Security is reversed; and

4. This case is remanded with the direction to award benefits from December 23, 1997.